[Crim. No. 376. Fifth Dist. Feb. 25, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT
PERRY FROGGE et al., Defendants and Appellants.

Rex R. Mull and William L. Caraway, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J. — Appellant Frogge, his wife, Sylvia, and appellant Tudor were each charged by a four-count information with kidnaping for the purpose of robbery, which resulted in bodily harm to the kidnaped persons, violation of Penal Code section 209; robbery of Ralph Smith; robbery of William Smith; and attempted murder of Ralph Smith.

On the morning of trial, Sylvia Frogge pleaded guilty to the included offense of count one of the information, kidnaping for the purpose of robbery, without bodily harm to the victim; the remaining three counts were dismissed as to her. An amended information was then filed as to defendants Tudor and Frogge, adding a charge of prior conviction of a felony as to each. Upon being arraigned on the amended information, each pleaded not guilty as to count one, violation of Penal Code section 209, kidnaping for the purpose of robbery with bodily injury; not guilty as to count four, attempted murder of Ralph Smith; guilty as to counts two and three, robbery of Ralph Smith and William Smith; and each admitted suffering the alleged prior conviction of a felony.

Before trial, defendants moved for a change of venue upon the ground that pretrial publicity by newspaper, radio and television so inflamed the community that a fair trial in Kern County was impossible. The motion was denied. Defendants did not petition the appellate court for a writ of mandate, and they now urge that because of pretrial publicity they did not receive a fair trial.

The uncontradicted evidence reveals that the crimes were committed in the following manner: Defendants and Sylvia Frogge entered the Ralph Smith home in Bakersfield on September 8, 1966, about 4 p.m. and the three held Mrs. Smith captive while they ransacked the home. The son, William Smith, came home shortly and he, too, was held captive. About 5:15 Ralph Smith, the husband and father, arrived and was accosted in the carport by Tudor who covered him with a gun and marched him into the house and into the kitchen, where Mrs. Smith and William were guarded by Frogge,

armed with a gun, and Mrs. Frogge, holding a knife. Frogge was wearing Mr. Smith's sport coat. Tudor and Frogge took wallets, money, watches and other personal belongings from Smith and his son, then decided to take Ralph Smith to his place of business in order to obtain money from the safe. Frogge told Tudor to watch Mrs. Smith and William while he took Ralph Smith to the office, and said: "If we are not back in thirty minutes, you kill these two." Tudor replied, "Okay if you are not back here in thirty minutes, I am to kill these two."

Ralph Smith was forced, at gunpoint, to drive Frogge to Smith's office, open the safe and remove the cash box, from which Frogge took approximately $450. They returned to the house, where Sylvia Frogge had been busy packing suitcases with household effects and other personal property of the Smiths. Tudor obtained some adhesive tape and told Frogge: "We will take them upstairs, tape them up, load the car, and I'll come back and do what has to be done." At gunpoint, the Smith family was marched upstairs to a bedroom where Mrs. Smith and William were directed to stay on the side of the room nearest the entrance and Ralph Smith was ordered to the far side. Tudor, who was covering Smith with his gun, ordered him to remove his shoes and lie on his stomach on the floor. As he leaned over to take off his shoes, Smith said to his son, "Billy, I've had enough. Let's go." He charged Tudor, who shot him when he was six or seven feet away and again from a distance of two or three feet.

Smith grabbed Tudor's gun hand and hit him in the face, knocking the gun to the floor. He picked up the gun, chased Tudor and shot at him three times as Tudor ran from the room, down the stairs and disappeared around a corner. Smith ran back to the bedroom where Mrs. Smith and William were struggling with Frogge. William grabbed a pair of scissors and started toward Frogge, who shot him in the cheek, knocking William out of the room into the hallway. Smith told his family he could handle Frogge and for them to get some help.

William escaped through a bathroom window and went to the front of the house to seek help from passers-by. Ralph Smith continued to struggle with Frogge until his left thigh bone, which had been struck by one of the bullets, broke, and he collapsed. Frogge then attempted to shoot him, but his gun was either empty or would not fire, and he left the room. Mrs. Smith returned, locked the door, left her husband lying on the

floor, and escaped through a window. Smith heard someone trying to open the door by kicking it, and heard Frogge's voice order: "Open this door." A shot was fired into the lock, but the door did not open.

Frogge then fled in Smith's pickup truck, but flipped it over at a corner. The truck came to rest in a service station lot, where Frogge was pinned in the wreckage, still wearing Smith's coat and in possession of other personal property belonging to the Smiths. Meanwhile Tudor, suffering from three bullet wounds, ran to a neighbor's home and was driven to the hospital.

Ralph Smith was shot four times; one bullet entered the middle of his chest and lodged in his back, where it remained at the time of trial, one shot struck his right thigh and two hit his left thigh, one fracturing the bone. During the struggle, Frogge bit almost through one of Smith's thumbs and inflicted a one-and-one-half-inch gash on the second finger of his right hand.

Defendants urge a number of points on appeal, but the principal grounds are that pretrial publicity prevented a fair trial and that the injuries inflicted upon the Smiths were not the kind contemplated by Penal Code section 209, which provides for increased punishment if the kidnap victim suffers bodily harm.

Turning, first, to defendants' charge that they were denied a fair trial, it must be conceded that there was pretrial publicity that might well have prejudiced the minds of many persons in the area. Publicity of this character is inevitable and no doubt will become more prevalent as the mobility of various media of communication is perfected. Even now immediate coverage of spectacular happenings is not unusual, and where a crime is accomplished by violence it is probable the public will view colored television pictures of the scene, and even of the victims. When an alleged perpetrator of the crime has suffered a prior conviction of a felony, he is quite likely to be characterized as an ex-felon, or an ex-convict, as were the defendants.

The Supreme Court has recognized the impact which pretrial publicity may have on the trial of an accused and the difficulty in assessing, after the fact, whether such publicity prevented the accused from having a fair and impartial trial. In *Maine* v. *Superior Court*, 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], the court makes it clear that where the denial of a motion for change of venue because of pretrial publicity

is to be raised in a reviewing court, the interests of justice are better served by a proceeding before trial.[1] It also laid down what it termed standards of reasonableness for the guidance of trial courts and appellate courts in determining a motion for change of venue upon the ground of prejudicial pretrial publicity. One of these standards, based upon the Reardon Report recommendation[2] that ''A showing of actual prejudice shall not be required'' (p. 383) gives rise to some difficult questions. Unlike *Maine,* the issue whether the trial court erred in denying a change of venue is raised here by appeal after trial, and counsel pose the preliminary question whether defendants must show actual prejudice.

Defendants argue that the rationale of *Maine,* which relieves the defendant of the burden of showing actual prejudice, applies to any review of the question of pretrial publicity, whether raised before or after trial. The People assert that the rule is limited to review on petition for writ of mandate before trial, and where the question is raised after a trial on the merits of the long-standing rule that an accused has the burden of showing that adverse publicity influenced the verdict of the jury, governs. (*People* v. *Modesto,* 66 Cal.2d 695 [59 Cal.Rptr. 124, 427 P.2d 788] ; *People* v. *Duncan,* 53 Cal.2d 803, 812-816 [3 Cal.Rptr. 351, 350 P.2d 103].)

The diverging points of view of counsel stem largely from a footnote to *Maine.* Although the opinion states clearly that it delineates a ''standard of reasonableness that should guide *trial courts* in the exercise of their discretion on *a motion for* a venue change and appellate courts, if pretrial review by *mandamus* is sought'' (p. 383; italics added), footnote (8) says that insofar as footnote (2) of *People* v. *Modesto, supra* (which requires an accused on appeal to show prejudice resulting from pretrial publicity) is contrary to *Maine,* it is disapproved. The People argue that since *Maine* was concerned with prejudice raised by a pretrial motion for change of venue or petition for writ of mandate, the disapproval in footnote (8) should be limited to those circumstances, and not applied to an appeal after trial. Defendants counter that since the issue of pretrial publicity was raised in *Modesto* by appeal after trial, disapproval of any part thereof

[1]This case was tried before the opinion in *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], was filed.

[2]American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966), commonly called the Reardon Report.

would be without relevancy unless applied to the facts of *Modesto,* namely, to an appeal after trial.

It seems to us there is no categorical answer, even though counsel take inflexible positions that are nearly diametrically opposed. Under the rationale of *Maine,* the thrust of the language ''defendant shall not be required to show actual prejudice'' is directed toward the kind of review the appellate court must make. It is held that in a mandamus proceeding before trial, the court must make an independent review of the record. At this point, before trial, the question of prejudice is prospective and the determinative factor is whether there is a reasonable likelihood that a change of venue is necessary to insure a fair trial. Where the issue is raised after trial, the review is retrospective and the test is whether the accused did, in fact, receive a fair and impartial trial. Before trial a court has no way to test the impact of publicity upon the individual triers of fact by *voir dire* examination because usually it is not known who will be called as the jurors in the case. Further, the court has no way of knowing, at proceedings prior to trial, what the evidence will be, how it will unfold, or how the jury will resolve the issues presented by the evidence. These imponderables weigh heavily in favor of granting a change of venue, simply because an accused's right to a fair trial cannot rest on speculation or conjecture.

On the other hand, when the issue of prejudicial pretrial publicity comes before a court on appeal after trial, the totality of circumstances is greatly enlarged; facets of the case unrevealed prior to trial are before the reviewing court. It seems to us that the nature of the alleged prejudice which a defendant contends prevented him from receiving a fair and impartial trial determines the particularity with which he must show prejudice, and likewise determines the scope of review. For example, he may be able to point to specific incidents, as in *Rideau* v. *Louisiana,* 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417], where after the defendant's arrest and before trial the sheriff conducted an ''interview'' in the jail, which was later televised—''It consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnaping, and murder.'' This performance, which the United States Supreme Court characterized as a ''kangaroo court,'' was shown on television three different times before the trial. At least ''Three members of the jury which convicted him had stated on their *voir dire* that they

had seen and heard Rideau's televised 'interview' with the sheriff on at least one occasion. Two members of the jury were deputy sheriffs of Calcasieu Parish. Rideau's counsel had requested that these jurors be excused for cause, having exhausted all of their peremptory challenges, but these challenges for cause had been denied by the trial judge.''

In the face of a charge of prejudice of this character, no independent review of the entire record would be required to determine the issue of prejudice; a case such as the one at bench is not so easily particularized—the prejudice alleged does not lend itself to specificity. The pretrial publicity was not injected into the trial by any particular act or fact, and defendants can do no more than point objectively to the pretrial publicity and to the jury's verdict. But this does not demonstrate prejudice; it is, in substance, an argument that the evidence does not support the verdict and, a fortiori, that the verdict resulted from the influence of prejudicial pretrial publicity. Can this reviewing court, under these circumstances, refuse to make an independent review of the record because defendants contend the pretrial prejudice subjectively permeated the entire trial? We think not, in view of the broad language of the Supreme Court in *Marshall* v. *United States,* 360 U.S. 310 [3 L.Ed.2d 1250, 79 S.Ct. 1171]; *Rideau* v. *Louisiana, supra,* 373 U.S. 723; *Estes* v. *Texas,* 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628]; *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507].

 In the context of an independent review of the record we examine, first, the *voir dire* examination of the jurors. The statements of the individual jurors are, in substance, as follows:

(1) Mrs. Bower thought she might have seen a televised newscast when the crimes occurred, and had some idea that there had been a robbery or a kidnaping, but had formed no opinions at all; she had no knowledge of the background of the defendants and did not know whether they were residents of the state or not; she had no feelings one way or the other against the defendants; she had seen a newscast the preceding evening, and she had seen pictures of the defendants, but did not know whether there was a reference to the charges against Tudor or whether disposition had been made of charges against him.

(2) Mr. Hubbard had read about the case in the paper and saw it on television, but did not recall what was stated about

the facts surrounding the crime. He did not hear or read anything concerning the background or prior history of the defendants; he knew the paper said that Ralph Smith had been shot but had formed no opinion as to how it happened; he felt it was likely that Smith had been shot and kidnaped since that was printed in the newspaper, but he did not form an opinion. He asserted he could put aside anything he knew about the case and would have no difficulty in distinguishing between facts heard in court and facts he had already heard or read about it.

(3) Mr. Rhoten believed that he had seen Mr. Frogge on television one time "but I am not even satisfied it was he." He had not read or heard anything about the case. He stated: "It wasn't brought to my attention or I don't remember it."

(4) Mrs. Wattenbarger knew from newspaper articles that a mistrial had been declared; she read an article concerning the disposition of the charge against Sylvia, and she was aware there had been some proceedings involving the defendants but she did not know what they were, other than that Mr. Tudor had entered a plea of guilty to robbery charges. She thought she had read some articles when the crime occurred and possibly at the time of the preliminary hearing, but she did not recall anything about it. She did remember reading that Ralph Smith had been kidnaped at gunpoint by somebody, and that Mr. Tudor had been shot, but did not recall the details. She did not read or hear or see anything mentioning the prior history or background of the defendants or their places of residence.

(5) Mr. Lane said he may have seen early television broadcasts but none recently, that he had seen a television picture of defendants and Sylvia Frogge. He knew nothing about articles at the time of the preliminary hearing, motion for change of venue, or change of trial judges. He had read that Ralph Smith and defendant Tudor had been shot, that Smith had been kidnaped at gunpoint, but did not remember what the news article had said, formed no opinion about it, had no feeling about it, and at the time he read it he was not concerned with it. He had read something about Mr. Tudor's prior history but did not recall it until he heard about it in court that day.

(6) Mr. Sanders said he had read headlines of some articles in the Bakersfield Californian but did not read the articles; that, other than the headlines, "I don't know a thing about

it,'' and that he had not been present when anyone else discussed any of the facts of the case.

(7) Mrs. Duntsch, who resided in Delano, saw something in the newspaper the first night, scanned it for familiar names and did not read it thoroughly or pay much attention to it; did not realize there was a kidnaping involved although she remembered there was a shooting.

(8) Mrs. Beaty read the headlines of some of the articles printed about the time of the crimes but stated she had not read any other news articles, as she seldom read the Californian. On the day the crimes were committed, she arrived home, turned on the television and there was a newscast on. She saw a wrecked pickup and thought one of the defendants had something to do with it, and saw a picture of the Smith residence. She saw, read or heard nothing else.

(9) Mrs. Challes had been out of the state much of the time between the date of the crimes and the date of trial, and had read, seen or heard very little about the crimes. She read one of the first articles in the Bakersfield Californian, but did not remember much about it; and thought possibly she had seen something on television when Mr. Smith was released from the hospital.

(10) Mr. Hunt had read several articles in the Bakersfield Californian and thought he had seen pictures of Tudor or Frogge or the Ralph Smith residence. He did not recall any of the details but he had the impression that Ralph Smith had been shot, that he had been kidnaped at gunpoint and that he had been robbed. He repeatedly stated that he did not remember what he had read such a long time ago.

(11) Mr. Darnell did not read the initial headliner articles though he conceded that he may have read something two or three days after the incident occurred. At any event, he did not pay much attention to it. About the only thing he remembered was that Ralph Smith was in the hospital and seriously wounded. He might have seen something on television but he could not remember it. He stated that about all he remembered was ''there was some kind of a scuffle'' at the Smith house and someone got shot.

(12) Mr. Geeslin stated that he had not followed the case, that he is ''not much one to read'' newspapers, that he glances at the paper and tosses it down. He may have had momentary exposure to television coverage or sketchy references to the case but none of it was impressed upon his memory.

Unlike *Sheppard* v. *Maxwell, supra,* 384 U.S. 333, where the trial judge would not let defense counsel ask the jurors whether they had read or heard specific prejudicial comment about the case, here Judge Ballantyne not only permitted extensive questioning of prospective jurors but himself questioned them at great length. He explained the importance of *voir dire* questioning and the purpose to insure that each juror would enter upon the trial of the case with an open mind. Neither is the case like *Rideau* v. *Louisiana, supra,* 373 U.S. 723, where, after the defendant had exhausted his peremptory challenges, the court refused to excuse two deputy sheriffs for cause and they served on the jury that convicted the defendant. Upon his own motion, the judge excused not only all persons who had formed an opinion about the case, as duty required, but he excused those who might be considered borderline. So thorough was the court in seeking impartial jurors that selection of the jury consumed five trial days, evidenced by 1,124 pages of the reporter's transcript.

The manner of jury selection is an important factor to be weighed in reviewing the question of fair trial, of course, but the radical element is how the jurors performed their duty. The final test must be the jury's verdicts as measured against the evidence upon which the verdicts are grounded. The fairness of the verdicts here can be judged clearly, because the evidence upon which the jury acted is remarkably free from inconsistencies and the trial was conducted with the utmost circumspection. There were no distractions during trial by various communications media or otherwise, as in *Sheppard* v. *Maxwell, supra,* and *Estes* v. *Texas, supra.*

Thus we turn to the question whether the verdicts, when analyzed in the light of the evidence, reflect that they are not supported by the evidence and, consequently, as defendants argue, can be explained only as being the product of prejudicial pretrial publicity. Each defendant pleaded guilty to the count charging him with the robbery of Ralph Smith, and each pleaded guilty to the count charging him with the robbery of William Smith. This left only the kidnaping and the attempted murder counts at issue.

The robberies were accomplished by two kidnapings; the first occurred when Frogge forced Ralph Smith at gunpoint to drive him to his office to remove money from the safe, the second, when all three Smiths were herded from the ground floor of their home to an upstairs bedroom. Tudor obtained

some adhesive tape and told Frogge, "We will take them upstairs, tape them up, load the car, and I'll come back and do what has to be done." When Smith and his son attempted to overpower Tudor and Frogge, Tudor shot Smith three times, and Frogge shot William once. Both defendants were charged with attempted murder; Frogge was found guilty; Tudor was not. There is no question that the verdict against Frogge is supported by the evidence. On the other hand, Tudor also could have been found guilty of attempted murder, under the uncontradicted evidence. That the jurors exercised their discretion in Tudor's favor by finding him not guilty negates defendants' argument that the jury was prejudiced against them because of pretrial publicity.

The verdict finding both defendants guilty of kidnaping with bodily harm and recommending life imprisonment without possibility of parole, rather than death, under section 209, presents a more complex problem. Whether the verdicts reflect the influence of pretrial publicity is relatively simple as it is clear from the uncontradicted evidence related above that Frogge and Tudor kidnaped and robbed the Smiths and that their victims were injured during the commission of the crime. The jury had the discretion of imposing the death penalty or the lesser sentence of life imprisonment without possibility of parole, as to each defendant, and chose the lesser penalty.

However, defendants make the additional argument that the jury might have been even more lenient with them had the judge permitted the jury to determine, as a question of fact, whether the injuries to the Smiths are within the purview of section 209. That section provides for a life sentence with possibility of parole if the kidnap-robbery victim suffers no harm, but where the victim suffers "bodily harm" the penalty is either death or life imprisonment without possibility of parole, in the discretion of the jury. It is argued that absent prejudice, the jury might have found the Smiths did not suffer bodily harm within the sense of the statute, and brought in a verdict of life imprisonment *with* possibility of parole. We conclude that since the evidence surrounding the shooting of the Smiths is clear and uncontradicted, whether the injuries inflicted are within the sense of the term "bodily harm" as used in section 209, presents a question of law for the court.

Defendants' argument that the meaning of the words "bodily harm" as used in section 209 is a question of fact, is

predicated largely upon the case of *People* v. *Baker*, 231 Cal. App.2d 301 [41 Cal.Rptr. 696, 11 A.L.R.3d 1046], where, in the hijacking of a truckload of liquor, the driver was placed in the van and hauled away with the cargo. He opened the door of the moving vehicle and jumped, injuring himself. The court held that the injury was not within the purview of section 209 because the bodily harm suffered by the victim was not the result of any intentional, gratutious aggravation of the completed crime by the kidnaper, nor suffered as a consequence of an actual threat of gratuitous aggravation of the completed crime.

*Baker* and the case at bench are not apposite; Smith did not run—indeed he could not, since he was confined to a room and held at gunpoint. The Smiths had every reason to believe defendants would not hesitate to kill them or inflict great bodily harm upon them. When Frogge forced Ralph Smith, at gunpoint, to drive him to his office to loot the safe, Frogge said to Tudor: "If we are not back in thirty minutes, you kill these two." Tudor replied: "Okay if you are not back here in thirty minutes, I am to kill these two." Again, just before taking the Smith family upstairs, Tudor said: "We will take them upstairs, tape them up, load the car, and I'll come back and do what has to be done." Following the threat to kill Mrs. Smith and William, the language, "I'll come back and do what has to be done," would seem, on the face of it, to mean an intent to kill all three, for there could be no other reason to return to the bound and taped victims.

The instant case is analogous to the situation in *People* v. *Monk*, 56 Cal.2d 288 [14 Cal.Rptr. 633, 363 P.2d 865], where the victim jumped from the kidnaper's moving car and was injured. The court determined that the victim was kidnaped for the purpose of robbery and, even though the kidnaper did not touch the victim, that her injury resulted from jumping out of the automobile when she feared bodily harm was threatened by the kidnaper. The court employed the doctrine of proximate cause and reasoned that the kidnaper's threats of bodily harm motivated the escape attempt, and concluded that the resulting injury was within the ambit of Penal Code section 209.

We are mindful that the negligence concept of proximate cause does not necessarily control an interpretation of section 209 simply because the Supreme Court used proximate cause as the vehicle for synthesizing the facts peculiar to *Monk*. Nevertheless, it seems clear to us that the Legislature used the

broad language in section 209 with an awareness that a victim of a kidnaping by force is seldom able to analyze his predicament dispassionately, and that he may be so perturbed that he cannot objectively make a choice between submitting to the kidnaper's commands and exercising a natural impulse to escape, or, as here, to protect his family and himself. We conclude, therefore, the Legislature intended that when one person kidnaps another for the purpose of robbery and manifests a ruthless disregard for the life of the victim, he takes the calculated risk that his victim may attempt to escape or resist rather than be tied and gagged, which is often the prelude to death by gunshot, stabbing or suffocation. Accordingly, in the light of the facts surrounding the kidnaping and the shooting of the Smiths, facts which are not in dispute, the bodily injuries are within the purview of Penal Code section 209 as a matter of law.

It follows that the trial court did not err in refusing to give defendants' proffered instructions based upon *People* v. *Baker, supra,* which would have left to the jury, as a question of fact, whether the injuries to the Smiths were "injuries" within the sense of section 209.

██ We turn to the alleged error in the manner the judge imparted judicial notice to the jury of defendants' pleas of guilty of robbing Ralph Smith, count two, and robbing William Smith, count three. Proof of robbery, an essential element of the crime of kidnaping for the purpose of robbery as delineated in Penal Code section 209, was obviated by defendants' pleas of guilty to the robbery charges. The trial judge advised the jury that "A statement made by a defendant other than at his trial may be an admission" (CALJIC 29), and instructed them that defendants' pleas of guilty constituted an admission to the robbery element of the crime of kidnaping. Defendants argue that the pleas of guilty were not made "other than at his trial," as the instruction stated, and from this the jury may have surmised that defendants made other admissions of guilt which were not in evidence. We deem this a makeweight argument at best, as the pleas of guilty had been entered to the court before the selection of the jury and, insofar as the jury that tried the case is concerned, the instruction was technically correct. We do not see how the jury could have been misled or how defendants were prejudiced by it; certainly the jury verdict should not be overturned upon such an attenuated ground.

██ Defendant Frogge asserts the court erred in not per-

mitting him to consult with his wife before the day of trial. We are not confronted with a situation where a defendant in custody was deprived of the opportunity to confer with a witness, qua witness, also confined to jail (14 A.L.R.3d p. 652). Mrs. Frogge was a defendant in the case, represented by independent counsel. At a pretrial hearing wherein Frogge moved the court for permission to interview his wife, her attorney advised the court that Mrs. Frogge intended to assert the defense of coercion by her husband. The attorney and Mrs. Frogge feared that unless her attorney was present during any conference between Frogge and his wife, the husband might attempt to coerce Mrs. Frogge to give up her defense because it was adverse to his interests. The trial court neither denied nor granted the motion, but issued a compromise order approving an interview by conference telephone in the Kern County jail where Frogge and his wife were confined. The order provided that the attorneys for Frogge and Mrs. Frogge should be parties to the conference telephone call.

After Mrs. Frogge pleaded guilty to the lesser included offense of kidnaping for the purpose of robbery without bodily harm, and the other counts against her were dismissed, counsel for Frogge advised the court that because the jail lacked necessary facilities it had been impossible to set up a conference call. He cited Frogge's inability to confer with his wife as prejudicial error. That no reversible error resulted is apparent from the trial judge's observation that the order had been made some months earlier, yet the matter was brought to the attention of the court for the first time on the morning of trial.

Frogge does not indicate in what respect his inability to interview his wife prejudiced his case, and none is apparent from the record. Moreover, the trial court granted Frogge permission to interview his wife privately for a *minimum* of 45 minutes before trial, and delayed Mrs. Frogge's transfer to the Department of Corrections for two days to enable both Frogge and Tudor to subpoena her as a witness if they so desired. Frogge talked with her privately, but neither he nor Tudor called her as a witness. We find no error in the court's handling of this aspect of the case.

Finally, objection is made to the sentencing technique on the ground it violates the proscription embodied in Penal Code section 654 against multiple sentences for a single crime. The trial judge followed the procedure outlined in *People* v.

*Niles,* 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11], by imposing sentence as to each count to which each defendant pleaded guilty or of which he was convicted, but staying execution on all except count one pending any appeal and until completion of any sentence under count one, the stays to become permanent upon completion of the sentence.

A number of cases have approved this procedure. In *In re Wright,* 65 Cal.2d 650, the Supreme Court said, at page 656, footnote 4 [56 Cal.Rptr. 110, 422 P.2d 998] : "Although the Legislature has not expressly provided for a stay of execution of sentence in the *Niles* situation, the power to proceed as the trial court did in that case is within the fair import of section 654. As the appellate court there explained (227 Cal.App.2d at p. 756) that procedure reasonably reconciles the policies involved in applying section 654 to protect the rights of both the state and the defendant."

The judgment is affirmed.

Conley, P. J., and Gargano, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 23, 1969.