[Crim. No. 16148. Second Dist., Div. Four. June 23, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT G. QUINLAN, Defendant and Appellant.

## COUNSEL

Paula M. Heim, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark Leicester, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KINGSLEY, J.**—Defendant and codefendants Gerald Joseph Gallant, Jr., and Robert Higuera, were indicted by the grand jury charging all defendants with four counts of kidnaping (Pen. Code, § 207), two counts of assault with a deadly weapon (Pen. Code, § 245), three counts of robbery (Pen. Code, § 211), and one count of burglary (Pen. Code, § 459).

Defendant pled not guilty, and not guilty by reason of insanity to each count; after a trial by jury he was found guilty on each count, and the

degree in counts VII through X (robbery and burglary) was fixed as second degree. Trial by jury on the insanity plea was waived and defendant was found to have been sane at the time of commission of the several offenses.[1]

The effect of the verdicts and judgment was, thus, as follows: Defendant was convicted of: (count I) kidnaping Dorothy Warren while armed with a deadly weapon; (count II) kidnaping David Baro while armed with a deadly weapon; (count III) kidnaping Robert Moore while armed with a deadly weapon; (count IV) kidnaping Francis Svehla while armed with a deadly weapon; (count V) assault with a deadly weapon on David Baro; (count VI) assault with a deadly weapon on Robert Moore; (count VII) robbery in the second degree of Charles Blodgett; (count VIII) robbery in the second degree of Mr. and Mrs. James Lowrey; (count IX) burglary in the second degree of the "Spicer Residence"; (count X) robbery in the second degree of Frank Svehla.

Pursuant to those convictions, defendant was sentenced to state prison for the term prescribed by law on each count. In an apparent attempt to comply with the requirements of section 654 of the Penal Code, the court (following the formula approved in *People* v. *Niles* (1964) 227 Cal.App.2d 749 [39 Cal.Rptr. 11]), stayed execution of the sentences imposed under counts IV, V and VI pending appeal and the service of the sentences imposed under counts X, II and III, respectively, said stays to become permanent upon the completion of each of said respective sentences. Since the assaults committed on the two victims involved in counts V and VI were done for the purpose of compelling them to accompany the defendants in the escape and, thus, were inherent parts of the kidnapings, we affirm the related kidnaping counts and reverse the assault counts. The robbery of Mr. Svehla, while contemporaneous with the kidnaping, was not necessarily an inherent part of that offense; the trier of fact could have concluded that it was not necessarily related to the escape; consequently we affirm both counts relating to Mr. Svehla.

### FACTS

On May 26, 1968, defendant was a patient at Atascadero State Hospital, as were codefendants Higuera and Gallant. Higuera and Gallant ordered Mr. Svehla, a psychiatrist technician, and other technicians, to turn over their keys and wallets. Then Higuera and Gallant locked the technicians in a room. Gallant held a knife at Svehla's throat and ordered

---

[1]Defendant Higuera was found incompetent to stand trial; as hereinafter appears, defendant Gallant was allowed to plead guilty to two counts and the other counts were dismissed as to him. Defendant was the only person indicted who stood trial.

him to answer the telephone. Defendant Gallant put on two security officers' uniforms.

Higuera forced Mrs. Dorothy Warren, an employee of the hospital, to accompany them; Higuera held a knife to her neck, and Gallant poked a gun through openings into the security office. Higuera told the guards to open up or he would kill Mrs. Warren.

Sergeant Baro and Officer Moore came out of the security office, defendant stabbed them both. The three defendants and all of the institutional officials got into Mr. Svehla's car and defendant drove the car. When the party reached the freeway, one of the defendants motioned to Mr. James Lowrey and his wife, who were driving along the freeway, to pull over and get out of their car. At gunpoint defendant and codefendants took their hostages into the Lowrey's car and drove off.

The group stopped at the residence of William Spicer and defendant watched the prisoners at gunpoint while the codefendants ransacked the house and changed clothes. Then the defendants tied the two officers to a bed and took a Buick from the premises.

Riding in the Buick, the party went north on Highway 101. Defendant was armed; they stopped at the Blodgett house, and at 6 p.m., Mr. and Mrs. Blodgett came home. Higuera and Mrs. Warren left and defendant, while armed, guarded the hostages. Defendant, Gallant and Svehla headed up Highway 101 and heard a police report about their escape. Mr. Svehla remained a prisoner until they reached San Francisco. The defendants ultimately were arrested in Ohio.

Quinlan's defense was that he had stabbed the guards to save their lives and to prevent Gallant from killing them and that Quinlan too had been a victim; defendant claimed he was coerced into doing what he did, that he had feared for his own life, and that he bandaged the guards' wounds and applied wet towels to their heads and otherwise tried to comfort them.

## I

On the record before us, it cannot be doubted that defendant was guilty of all of the offenses charged. His sole defense on the merits was the claim of coercion—a claim that the jury obviously rejected.

Defendant, however, contends that that defense was not adequately presented to the jury, in that a requested instruction on coercion was refused by the trial court. The contention is without merit.

The instruction requested was as follows: "Persons are not capable of committing crimes who committed the act or made the omission charged

under threat or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

■ The record shows that the trial court gave CALJIC 71-F (Rev.) as follows: "A person is not guilty of crime when he commits an act or engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:

"1. Where the threats and menaces are such that they would create in the mind of a reasonable person the fear that his life would be in imminent and immediate danger if he did not commit the act or engage in the conduct charged, and

"2. If such person then believed that his life would be so endangered.

"This rule does not apply to threats, menaces, and fear of future danger to his life."

The instruction given by the trial court clearly covers the issue. ■ A court may refuse to give a defendant's instruction on an issue where that issue is covered by other instructions. (*People* v. *Arguello* (1964) 61 Cal.2d 210 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Galvan* (1962) 208 Cal.App.2d 443 [25 Cal.Rptr. 128].) Further, defendant's instruction omits any statement that the fear of the person coerced must be a fear of "immediate" danger. ■ An instruction on threat and menace which omits the element of immediacy of danger as an excuse for criminal conduct is error. (*People* v. *Otis* (1959) 174 Cal.App.2d 119, 125 [344 P.2d 342].)

## II

■ Defendant complains that his codefendant Gallant was allowed to plead guilty to only two of the ten counts in the indictment, the other eight being dismissed, whereas defendant, by not entering into such an arrangement, was tried and convicted on all ten counts. He argues that this was an unconstitutional penalty for insisting on his right to trial and to trial by jury.

The contention is without merit. Insofar as it rests on a contention that he did not receive equal treatment with his codefendant, the argument is long since settled adversely to defendant. Insofar as it rests on the idea that he has fared worse that he might have fared under a negotiated plea, the answer is twofold: (1) Nothing in this record indicates that he could have negotiated, or that he was morally entitled to negotiate for a more favorable treatment;[2] and (2) Defendant's plea and trial obviously were

---

[2]Underlying that theory is the theory that defendant was the least guilty of the three escapees. But the jury's verdict indicates that it did not accept that contention; the prosecutor may well have been equally skeptical.

motivated by his hope that he would secure an acquittal and avoid all punishment; he cannot now complain that that risk turned out unfavorably.

## III

The final contention urged on behalf of defendant is that the trial court erred in denying his request for a change of venue.

Defendant relies on *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372], where the Supreme Court, in determining a writ of mandate sought to compel a change of venue in a case involving a capital crime, approved a standard proposed by the American Bar Association Project on Minimum Standards for Criminal Justice (the "Reardon Report"), which reads as follows: " 'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required.' "

Although the court indicates, by its footnote number 9 on page 384 of that opinion,[3] that the standard quoted will be applied not only in mandate cases but also in appeals after trial, it does not follow that the showing required to invoke the standard will necessarily be the same in both procedural situations. ■ In neither situation need a defendant show "actual prejudice." But, in determining whether or not the record shows a "reasonable likelihood" of prejudice, a trial court, and a reviewing court, may and must look at all the data available to it.

*Maine* gave to a defendant for the first time a choice of procedures to avoid the effect of pretrial publicity. He may make such showing as he can, prior to trial and prior to the *voir dire* examination of potential jurors, and, if his motion based on that showing is denied, seek a writ of mandate to reverse the adverse ruling. Or he may do, as defendants did before *Maine* and as defendant did here, *voir dire* the jurors and, based on that showing plus whatever other proof of potential prejudice may be available, move for a change of venue, but with review of a denial available only

---

[3]The court said: "The standard discussed herein will be applied on direct review in all cases which have not proceeded to trial at the date this opinion becomes final." The opinion in *Maine* was filed on March 18, 1968; it became final on April 17, 1968 (Cal. Rules of Court, rule 24(a)); the motion for change of venue in the case at bench was denied on October 14, 1968, and the trial began on October 15, 1968. Obviously *Maine* is applicable on this appeal.

after trial and conviction. ■ If a defendant elects the pretrial mandate alternative, he may well be in a position to urge that doubts be resolved in his favor. But if he elects to await trial and conviction before he seeks appellate review, he cannot complain if inferences of possible prejudice, available on a semi-silent record, have been refuted by the actualities of *voir dire* and of trial.

Bearing in mind that we read the record to discover "reasonable likelihood" and not "actual" prejudice, we turn to the showing herein made.

Although defendant's motion relied on newspaper articles and radio reports, no newspaper articles, nor any transcript of a radio broadcast, appear in the record. We have before us, and can consider, only the oral testimony summarizing and characterizing the articles and the broadcasts. (*People* v. *Doebke* (1969) 1 Cal.App.3d 41, 47 [81 Cal.Rptr. 391].)

An examination of the evidence produced shows that the news coverage was normal and factual.

Mr. Walter Beesley, a reporter for the San Luis Obispo Telegram Tribune, testified that news coverage was "normal," that he had read that defendants were extremely dangerous and that Mr. Gallant was the purported leader of the group; Mr. Beesley got his information from law enforcement officers.

Mr. Barnett, a news reporter of an independent news service, testified that news coverage was normal, and he heard no threats or hostility towards defendant.

Mrs. Buford heard a radio report on the escape during the time she was held captive. She heard that two guards were thrown from the escapees' car but did not recall hearing defendant's name.

■ In short, the type of publicity did not prejudice defendant's defense. Defendant's defense was not that he never committed the acts alleged to have been committed by him, but that he committed those acts because he was in fear for his own life and because otherwise worse harm would have been done to the officers. Nothing in the publicity negates or reflects upon defendant's defense of coercion. The publicity simply related to those facts substantially admitted (or not denied) by defendant.[4]

Further, the transcript of the *voir dire* shows that four jurors heard or

---

[4]We have not overlooked the fact that some of the publicity had characterized the escapees (but without individual identification) as "extremely dangerous." The record shows that that statement was factually correct; nothing in it could have prejudiced the defense relied on which, in essence, was bottomed on the identical contention by defendant as to his companions.

read nothing about the case and the others who heard or read newspaper accounts on the escape formed no opinion as to guilt or innocence. The judge below was thorough in seeking impartial jurors, and the evidence supported the verdict of the jury. (See *People* v. *Frogge* (1969) 270 Cal.App.2d 106, 113-117 [75 Cal.Rptr. 517].)

On this record, we cannot say that the trial court erred in concluding that there was no reasonable likelihood of prejudice from the pretrial publicity.[5]

## IV

Although counsel on this appeal raises no contention thereon, we examine, on our own motion, certain procedural events. Proceedings were instituted, under section 1368 of the Penal Code, to determine defendant's capacity to stand trial. Those proceedings resulted in a finding that he was competent. Thereafter, at his request, he was allowed to represent himself, with an attorney attending in an advisory capacity. After the trial on the guilt phase, that attorney was appointed as counsel for defendant and conducted on his behalf the proceedings on the insanity plea. The record brought here does not contain a reporter's transcript of the proceedings by which original counsel was relieved and the pro. per. with advisor status was established. However, we have read the proceedings at the trial. Defendant conducted the trial with reasonable effectiveness; at no time did his advisory counsel suggest that the pro. per. status should be terminated; defendant testified, on his own behalf, in support of his affirmative defense. On the whole record we conclude that, even if an examination of the omitted transcript should suggest error in allowing defendant to represent himself, we have no reasonable doubt but that any such error (if it existed) was not prejudicial. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

The judgment on counts V and VI is reversed; otherwise the judgment is affirmed; the appeal from the order denying a new trial is dismissed.

Jefferson, Acting P. J., and Dunn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 19, 1970.

---

[5]As the above analysis shows, this court has, in conformity with *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507], made an independent examination of the circumstances and has satisfied itself, de novo, on all the exhibits and affidavits and on the testimony, that defendant did obtain a fair and impartial trial.