[Crim. No. 15450. In Bank. Nov. 27, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY MONTOYA LARA, Defendant and Appellant.

## COUNSEL

J. Perry Langford, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby and Edward A., Hinz, Jr., Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., Russell Iungerich and Edward T. Fogel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Tony Montoya Lara was convicted of first degree murder (Pen. Code, § 187) and kidnaping for the purpose of robbery with the victim suffering bodily harm (Pen. Code, § 209). He was sentenced to death on the murder count and to life imprisonment without possibility of parole on the kidnaping count. The judgment was affirmed. (*People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202].) Thereafter, under compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the judgment was reversed insofar as it imposed the death penalty and was affirmed in all other respects. (*In re Lara* (1969) 1 Cal.3d 486 [82 Cal.Rptr. 628, 462 P.2d 380].) Upon retrial of the penalty issue defendant's punishment was again fixed at death, and his automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], we held that the death penalty violated our state constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 6.)[1] And in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the United States Supreme Court ruled that imposition of the death penalty in these circumstances contravened the federal Constitution. As defendant's death penalty must therefore be set aside, it is unnecessary to consider the claims of error arising out of his second penalty trial.

By supplemental brief, however, defendant presents additional contentions relating to the judgment of guilt. He first asserts that under *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225], there is insufficient evidence as a matter of law to support his conviction on the

---

[1]For the effect of article I, section 27, of the California Constitution on this issue, see *People* v. *Murphy* (1972) 8 Cal.3d 349, 352, footnote 2 [105 Cal.Rptr. 138, 503 P.2d 594].

kidnaping count. Inasmuch as *Daniels* was decided after we affirmed the judgment of guilt in this case, defendant had no opportunity to raise the issue at trial or on appeal; moreover, we have since held that on a proper showing relief under *Daniels* may be granted on collateral attack. (*People* v. *Mutch* (1971) 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633].) For these reasons we will permit defendant to challenge his kidnaping conviction on the *Daniels* ground in the present appeal. (*People* v. *Ketchel* (1966) 63 Cal.2d 859, 865-866 [48 Cal.Rptr. 614, 409 P.2d 694].)

The facts relevant to this contention were set forth as follows in our first opinion in this case (*People* v. *Lara, supra,* 67 Cal.2d 365): "About 3 p.m. on May 23, 1965, the body of Raymond Mitchell was discovered in a large excavation used as a dump near Wilmington, California. He was lying on a ledge some 15 feet below the top of the excavation. His hands were tied behind his back with strips torn from his T-shirt. He had been shot in the back with a shotgun, death being caused by massive hemorrhages of the vital organs. Officer Taggart of the Los Angeles Police Department, the first to reach the scene, found two spent shotgun shells on the ground nearby. The deputy coroner fixed the time of death at between 3 a.m. and 8 a.m. that same day.

"That evening, Mitchell's car, a light-colored 1951 Chevrolet, was found abandoned approximately two miles away in an area known as the Bixby Slough. It was stuck, and could not be moved either forward or backward under its own power. Officer Taggart examined the vehicle and observed a discoloration appearing to be blood on the steering column.

"Augustine Meza testified that about 1:30 a.m. on May 23 he was offered a ride by Mitchell in the latter's Chevrolet. They drove to a liquor store to buy some cigars. Meza declined Mitchell's offer of a drink from a bottle of wine, explaining he had been drinking since a wedding reception the previous afternoon. Ten or fifteen minutes later they drove to a lumberyard where they encountered defendants Lara and Alvarez, known to Meza respectively as 'Tony' and 'Baby.' Lara and Alvarez entered Mitchell's car, saying 'Why don't you take us for a ride?' Meza then asked to be driven home, and Mitchell complied. It was 2 a.m.; Meza had something to eat, and went to bed.

". . . . . . . . . . . . . . . . . .

"The first part of [Lara's] statement[2] corroborated the information given by Meza as to what occurred in the early morning hours of May 23. After

---

[2]Lara's confession was properly admitted at the trial. (See *People* v. *Lara, supra,* 67 Cal.2d at p. 375 ff.)

taking Meza home, according to Lara, Mitchell drove back to the lumber-yard with him and 'this other person.' [Fn. omitted.] Lara retrieved a shot-gun he had 'stashed' there, and upon returning to the car displayed it to Mitchell and asked, 'Do you know what this is?' There was a scuffle, then Mitchell began driving at their direction. They stopped at the dump near Wilmington, and Lara ordered Mitchell to take off his coat and shirt. Mitchell refused, and Lara warned that if he did not do it by the count of five he would hit him and the other person would shoot him. Mitchell either fainted or was knocked unconscious. Lara kicked him twice in the head; they removed his coat and shirt, tore off part of his undershirt, and used it to tie his hands behind his back. They first put him in the trunk of the car, but were unable to close the lid. They then carried him to the edge of the excavation and threw him over. Lara obtained the gun from the car, set the choke, and shot Mitchell in the back as he lay on a ledge below. The other person took the gun, reset the choke, and also fired a shot at Mitchell. According to Lara, he and his companion wanted Mitchell's car for the purpose of using it in the commission of an armed robbery, and they killed him to prevent him from identifying them.

"The two then drove away, looking for a place to rob. Finding none to their liking, Lara took the other person home. Lara then removed some small objects from the car, wiped it clean of fingerprints, and 'ditched' it when it stuck in a field." (67 Cal.2d at pp. 369-370, 372-373.)

In *People* v. *Daniels, supra,* 71 Cal.2d 1119, we held that "the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach . . . those [robberies] in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (71 Cal.2d at p. 1139.) Applying this standard to the instant case, we have concluded that the asportation to which defendant and his companion Alvarez subjected the victim Mitchell prior to murdering him was such that conviction under section 209 was proper.

The record clearly establishes—out of Lara's own mouth—that he and Alvarez wanted Mitchell's car for the purpose of using it in an armed robbery, and that they resolved to kill Mitchell in order to prevent him from later identifying them. When they returned to the lumberyard after taking Meza home, they obtained a shotgun which Lara had hidden there and, presumably concluding that the dump near Wilmington was a pre-ferable site for robbery and murder, threatened Mitchell with the weapon

and caused him to drive them to the dump.[3] There they carried out their vicious plans.

We conclude without hesitation that the asportation of the victim Mitchell from the lumberyard to the dump near Wilmington was not "merely incidental to the commission of the robbery" and that it "substantially increase[d] the risk of harm over and above that necessarily present in the crime of robbery itself" within the meaning of *Daniels.* "The fact that . . . defendant[s] chose to consummate the robbery at a location remote from the place of initial contact does not render the subsequent asportation 'merely incidental' to the crime, for it is the very fact that defendant[s] utilized substantial asportation in the commission of the crime which renders [them] liable to the increased penalty of section 209 if that asportation was such that the victim's risk of harm was substantially increased thereby. Clearly, any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes [him] to grave risks of harm to which [he] would not have been subject had the robbery occurred at the point of initial contact." (*People* v. *Thornton* (1974) 11 Cal.3d 738, 768 [114 Cal.Rptr. 467, 523 P.2d 267].) Here to be sure, the record does not affirmatively indicate that Lara or his partner kept the shotgun trained on the victim during the course of the asportation. (Cf. *People* v. *Thornton, supra,* at p. 768 (victim Ottillia J.); *People* v. *Milan* (1973) 9 Cal.3d 185, 189-193 [107 Cal.Rptr. 68, 507 P.2d 956].) This, however, is not the determinative factor in cases of this kind. (See *People* v. *Beamon* (1973) 8 Cal.3d 625, 636 [105 Cal.Rptr. 681, 504 P.2d 905].) ██ The crucial inquiry under *Daniels* is whether a defendant, in the course of his asportation of the victim for purposes of robbery, has created a situation having a substantially increased potential for serious harm to the victim. Such a situation is clearly brought into being when, as in this case, the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. The fact that the potential for serious injury inherent in such a situation[4] is not actualized during the course of the asportation itself—and that injury occurs only after the asportation has ceased—is simply not relevant to the issue.

---

[3]We reject as patently incredible defendant's contention, based upon his trial testimony, that Mitchell "voluntarily" drove him and Alvarez to the dump after being threatened with the shotgun at the lumberyard. The fact that a victim, after being threatened with a deadly weapon, complies with the orders of his captors without apparent complaint surely does not render such compliance "voluntary" in any meaningful sense of that word.

[4]It takes but little imagination to envision the kind of violent events whose likelihood of occurrence is great in a situation of this kind. Ready examples include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties.

Defendant also complains that on the guilt phase of his trial the prosecution (1) failed to show that the arresting officer had probable cause to believe defendant was inside his sister's house where the officer found him, and (2) used "lie detector evidence" to establish probable cause for defendant's arrest. Seeking to justify raising these issues at this late date, defendant contends that his former counsel should have presented them at trial or on appeal, and that the failure to do so amounted to a denial of his constitutional right to effective assistance of counsel. Although there is considerable question whether defendant may properly make these points in the present proceeding (see *People v. Vaughn* (1973) 9 Cal.3d 321, 326, fn. 3 [107 Cal.Rptr. 318, 508 P.2d 318]), we need not resolve the matter because the points themselves are without merit.

As to the first claim, it is the law of this case that the officer had reasonable cause to arrest defendant on a charge of murder. (67 Cal.2d at pp. 373-375.) ██ The officer was justified in interviewing defendant's sister at her house. (*People v. Michael* (1955) 45 Cal.2d 751, 754 [290 P.2d 852].) Defendant's sister did not resist his entry, but rather "let the officer into the living room." (67 Cal.2d at p. 371.) Defendant then appeared, and was placed under arrest. Inasmuch as there was no forcible entry, the prosecution was not required by Penal Code section 844 to show "reasonable grounds for believing" that defendant was actually inside.

Defendant's second complaint is that an investigating officer testified that the material witness on probable cause had submitted to a lie detector test and this event substantiated his belief that the witnesses' story was credible. ██ But whatever may be the rule on the admissibility of the *results* of a polygraph test as evidence of *guilt*—a question we do not reconsider today—we are cited to no authority holding such collateral use of the test for investigative purposes to be improper. Moreover, this court in fact placed no reliance on the foregoing testimony in determining there was probable cause for defendant's arrest. (67 Cal.2d at pp. 373-375.)

The judgment, insofar as it provides for the penalty of death on the murder count, is modified to provide a punishment of life imprisonment on that count, and as so modified the judgment is affirmed as to both counts.

Wright, C.J., Tobriner, J., Clark, J., and Burke, J.,* concurred.

**MOSK, J.**—I concur insofar as the judgment is modified to provide for life imprisonment on the murder count.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

I dissent, however, from the affirmance on the kidnaping count. The majority declare (*ante,* p. 908) that the substantial increase in the risk of serious physical harm to the victim required by *Daniels* to support a conviction under section 209 "is clearly brought into being when . . . the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon." I reject such an oversimplified rule. A "threat of imminent injury by a deadly weapon" may sound impressive, but in this context it is nothing unusual; such a threat is a common method by which the victim of a simple kidnaping under section 207 is persuaded to accompany his or her abductor. (See e.g., *People* v. *Stanworth* (1974) 11 Cal.3d 588, 603-604 [114 Cal.Rptr. 250, 522 P.2d 1058] (knife); *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892] (gun); *People* v. *Iverson* (1972) 26 Cal.App.3d 598, 601 [102 Cal.Rptr. 913] (knife); *People* v. *Gibbs* (1970) 12 Cal.App.3d 526, 533 [90 Cal. Rptr. 866] (knife and club); *People* v. *Quinlan* (1970) 8 Cal.App.3d 1063, 1067 [88 Cal.Rptr. 125] (gun and knife).) The rule is thus no more than a rephrasing of the *Thornton* rationale, also repeated with approval by the majority here, that a significant increase in risk of harm is shown by " 'any substantial asportation which involves forcible control of the robbery victim. . . .' " (*Ibid.,* quoting from *People* v. *Thornton* (1974) 11 Cal.3d 738, 768 [114 Cal.Rptr. 467, 523 P.2d 267].)

As I explained in my dissent in *Thornton* (*id.* at p. 77), however, "Forcible control, as this court recently and unanimously held, is an essential ingredient of *all* kidnaping under California law. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 659-660 [111 Cal.Rptr. 556, 517 P.2d 820].) It follows that a definition couched merely in terms of forcible control fails to distinguish between simple and aggravated kidnaping." Yet because the penalties for the two offenses are vastly different in severity such a distinction must be drawn, under pain of violating the equal protection clause. (See, e.g., *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) As I further observed in my *Thornton* dissent, "under the majority's view the present defendant must be found guilty of aggravated kidnaping —but not an intended robber who renders his victim unconscious, or securely binds and gags [him], before driving exactly the same distance. The contrast underscores the arbitrariness of the majority's reliance on the single element of 'forcible control,' rather than the totality of the circumstances placed before the jury, in determining whether the movements resulted in a substantial increase in the risk of harm." (11 Cal.3d at p. 782.)

When the totality of those circumstances is considered, it will immediately be seen that in the case at bar the manner in which the victim was moved was not highly dangerous within the meaning of our prior cases.

In contrast to *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145], and *People* v. *Ramirez* (1969) 2 Cal.App.3d 345 [82 Cal.Rptr. 665], there was no reckless, high-speed chase with police in hot pursuit; in contrast to *People* v. *Milan* (1973) 9 Cal.3d 185 [107 Cal.Rptr. 68, 507 P.2d 956], and *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal. Rptr. 681, 504 P.2d 905], the car was not operated in city traffic at gunpoint, while the victim made desperate attempts to save himself with the vehicle in motion. Here, although the jury impliedly found on proper instructions that Mitchell did not consent to the asportation, the evidence is uncontradicted that he drove his own car in a normal manner and apparently made no effort to attract the attention of police or passersby, if any.

The irony is that the Attorney General does not contend to the contrary. He does not urge that the movement of Mitchell "under the threat of imminent injury by a deadly weapon" itself created the requisite increased risk of harm. The majority's rationale finds no support in the brief of the Attorney General. Rather, he argues that defendant increased the risk of harm by moving Mitchell from a "public" lumberyard to a "secluded" dump where the robbery and deadly assault could be accomplished with less chance of being observed by third persons. But the facts do not support this theory either. The events in question took place shortly after 2 a.m. on a Sunday. The People concede in their supplemental brief that defendant "could have taken Mitchell's car at the lumberyard"; considering the hour, in so doing he could also have fired the fatal shot at that location with little fear of attracting unwanted attention. Even a "public" lumberyard, I suggest, is scarcely a beehive of activity at 2 o'clock on a Sunday morning.[1]

Thus even if the asportation here may conceivably have increased the risk of harm to Mitchell in some degree, it cannot have "substantially" increased it as required by *Daniels*. Under the rule of *People* v. *Mutch* (1971) 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633], defendant was convicted of kidnaping to commit robbery under a statute which did not prohibit his acts at the time he committed them, and he is therefore entitled to relief. I would vacate the judgment on the kidnaping count.

**McCOMB, J.**—I concur except to the extent that the opinion modifies the death penalty on the murder count.

Appellant's petition for a rehearing was denied January 8, 1975. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

[1] The lateness of the hour also refutes the majority's speculation that unforeseen intervention by third parties during the asportation was a "great" likelihood. (*Ante,* p. 908, fn. 4.) The chances of running into a late reveller or an early riser between the lumberyard and the dump were slim indeed.