Filed 9/6/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>PHALON AMAD HALL et al.,<br><br>     Defendants and Appellants. | G062749<br><br>(Super. Ct. No. FVI19001543,<br>  FVI19001544)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Kawika Smith, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Phalon Amad Hall.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Patrick Redman.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

This appeal arises out of a conviction for home invasion robbery and kidnapping, together with various sentencing enhancements, including gang enhancements. The two defendants are Phalon Amad Hall, who was tried as one of the robbers, and Patrick Redman, who was tried as an aider and abettor for allegedly helping recruit a robber, providing the firearm used in the robbery, and acting as the getaway driver. Defendants raise numerous issues, two of which warrant a partial reversal.

First, both defendants were convicted of kidnapping. After the victim met the robbers at the door, the robbers pushed into the house and proceeded to beat the homeowner. Afterward, they forced him upstairs so that he could open a safe and then took him back downstairs to tie him up while they continued looting the house. This movement up and down the stairs, the prosecution argued, constituted kidnapping. We disagree. For kidnapping, the movement must be "substantial." This was not. Accordingly, we reverse the conviction for kidnapping.

Second, the defendants each received two sentencing enhancements that were based on their participation in a criminal street gang. After the trial, the Legislature amended the definition and proof requirements to establish the existence of a criminal street gang in ways that require different factual findings than the findings the jury made here. Those amendments operate retroactively. The Attorney General concedes the error. Accordingly, we also reverse the gang-related sentencing enhancements.

Our disposition will require a complete resentencing. In all other respects, we affirm the judgment.

FACTS

*The Robbery*

On August 15, 2018, at about 2:40 p.m., [A.T.] saw defendant Phalon Amad Hall, his neighbor from four doors down, walking toward his front door. A.T. grew marijuana at his house, which A.T. and Hall had smoked there in the past. When A.T. answered the door, another man was standing behind Hall. A.T. shut the door and went to get marijuana for Hall from inside his house. A.T. returned and as he again opened the front door, he saw Hall make a sudden movement toward his waistband, which caused A.T. to feel threatened. A.T. tried to close the door, but three Black males forced their way into his house at gunpoint.

After striking A.T. with an unknown object, the robbers demanded marijuana and money. A.T. was forced upstairs at gunpoint to open his safe, which contained rifles, camera equipment, and jewelry. The robbers then took A.T. back downstairs. At some point (the timeline was murky in A.T.'s recollection due to the trauma), the intruders took A.T. into the garage, where they made an unsuccessful attempt to start a vehicle belonging to A.T.'s friend. Ultimately, the intruders tied A.T. to a chair in the kitchen where they proceeded to pistol whip him and beat him. Before leaving, one of the robbers said "something about Crips" and Long Beach and that he would be coming back.

The robbers left through the back door carrying a potted marijuana plant, jars of seeds, A.T.'s cell phone, money, the rifles, and a soft case consistent with a bag of camera equipment from A.T.'s safe.

After waiting awhile, A.T. freed himself. The robbers had taken his cell phone so he went to a neighbor's house to call the police.

3

*The Investigation*

San Bernardino County Sheriff's deputies arrived at about 3:32 p.m. They found the front door to A.T.'s house open and the living room in disarray. Shoe tracks with two different tread patterns led from the back sliding glass door through the back yard heading west toward a cinder block wall at the rear of the property. Another set of fresh shoe tracks were found on the other side of the cinder block wall, heading northwest to a drainage culvert by an aqueduct. A.T.'s marijuana plant was found on the culvert.

A.T. described the robbers as Black males between 20 and 25 years old. One of them was about six feet tall, with a thin build, wore a blue bandana tied around his forehead, and had braids. Another robber was about five feet four inches tall, appeared to be homeless, and was wearing a black shirt. A.T. later identified this individual as Darnell Winters in a photo lineup. Based on images from the home surveillance video, Jamal Davenport, Hall's brother, was identified as another robber. A.T. told an investigating officer that he did not see Hall inside his home during the robbery. However, the surveillance footage only shows three suspects approaching and later leaving A.T.'s home, one of whom was Hall. Moreover, Hall is approximately six feet tall and, as described below, was later found with a blue bandana.

Patrick Redman was on parole in August 2018 and wearing a global positioning system (GPS) ankle monitor. Logs and three videos of Redman's tracked activity from the GPS system were admitted into evidence. At 10:31 a.m., Redman was located near a Burger King (a fact that will become significant later). At 12:31 p.m., Redman was in the area where both Hall and A.T. lived. At 2:37 p.m., Redman was near the aqueduct behind A.T.'s home. At 2:43 p.m., a vehicle resembling Redman's vehicle can be seen passing A.T.'s house in his surveillance footage. At 2:47 p.m., Redman was at

4

Hall's residence.  At 3:08 p.m., the robbers can be seen on A.T.'s surveillance system exiting through the backyard and jumping the backyard fence.  Redman was again near the aqueduct behind A.T.'s house at about 3:25 p.m.  Redman was at a gas station at 3:42 p.m., and then he headed south on Interstate 15 at 3:46 p.m.

On August 16, 2018, the following day, law enforcement conducted a traffic stop of Redman's black Mercedes in San Bernardino and detained the occupants: Redman, Hall, Davenport, and Anthony Ector.  A blue bandana was found on Hall.  The Mercedes had Pittsburgh Steelers' emblems on the headrest covers and floor mats.

Anthony Ector's cell phone, found inside the Mercedes, contained photographs of Ector and Redman holding guns and wearing clothing associated with the Rollin 20s Crip Gang.  A video also downloaded from Ector's phone was played for the jury.  During the video, Redman was heard saying "On 20" and Ector said, "Rollin gang."

In the trunk of the Mercedes, deputies found a Victor Valley College backpack and a black pullover sweater, the same sweater and backpack worn by one of the robbers seen on the surveillance video of the robbery at A.T.'s home.  Jars of A.T.'s marijuana seeds and a Sony camera were found in the backpack.  A Nikon camera was also found in the trunk.

During a search of Redman's house, deputies found clothing associated with the Rollin 20s gang.  During a search of Hall's home, deputies found a fall 2018 Victor Valley College student identification card with a photo of Hall in a wallet.

Texts using the name "itzuhvibe" were sent from Hall's Instagram account.  On August 8, 2018, one week before the robbery, "itzuhvibe" and "officialjayyy2," associated with Jamal Davenport, discussed

committing a "licc" (i.e., a robbery) that night at A.T.'s house, specifically referencing A.T.'s home address. On August 14, the day before the robbery, Hall sent messages attempting to recruit another for the robbery, stating, "I gotta licc on Crxp," and "Hit the licc with me, Cuhk. 5 pounds in the house." "Crxp" is a variant spelling of the gang's name Crip, and the pounds refers to the weight of drugs.

On the morning of August 15, 2018, messages between "Itzuhvibe," using Hall's Instagram account, and "officialjayyy2" again discussed committing a robbery. "Itzuhvibe" said his father was on the way and was bringing his gun. Hall asked Davenport to meet him at the aqueduct.

*Testimony of Accomplice Darnell Winters*

Darnell Winters entered a plea agreement in which he agreed to testify on behalf of the prosecution in exchange for leniency for his involvement in the A.T. robbery and to avoid a life sentence. Winters testified he lived in Anthony Ector's garage in San Bernardino. On August 15, 2018, Winters left Ector's garage to go to Burger King, and when he came out, he saw Patrick Redman, who was parked in a black Mercedes in front of the Burger King Restaurant. Because Winters owed Redman money for methamphetamine, Redman told Winters to help his son Hall get back some property that was stolen from him. Redman and Winters then drove to Redman's house, where Redman got a gun and gave it to Winters. Redman and Winters drove to Hall's home, where they met with Hall and Davenport. Winters gave the gun to Hall. Redman waited in his car while Winters, Davenport, and Hall walked from Hall's house to A.T.'s residence. Hall went to the front door and asked A.T. for some weed. Hall was holding a gun and

6

trying to get through the front door as A.T. tried to close it. Davenport and Winters helped Hall get inside.

A.T. fell to the floor and Hall, Davenport, and Winters began kicking him. After moving A.T. further into the house, the three rummaged around for marijuana and money. Hall forced A.T. upstairs at gunpoint to open the safe.

After A.T. opened the safe, he was forced back downstairs, and Davenport pointed Redman's gun at A.T.'s head and tied A.T. to a chair. The group took cameras, jewelry, a cell phone, and rifles. They left A.T.'s residence through the back door, traversed a dirt field, and went over a brick wall, where they met with Redman and placed the stolen items in the trunk of his Mercedes.

Redman stopped at a gas station about 15 minutes away for gas. Winters was taken back to Ector's house and the others left. Winters testified that Ector did not participate in the robbery.

*Custodial Assault on Winters*

On February 7, 2019, after making a court appearance, Winters was in a courthouse holding cell with Hall and more than 10 other inmates. When Redman walked by, he asked Hall why he was hanging out with that "snitch." At that moment, Hall and everyone else in the cell attacked Winters. Sheriff deputies found Winters on the floor of the cell with injuries to his head, eyes, nose, and forehead.

When interviewed, Hall said Winters swung at him first and they engaged in mutual combat. Winters testified Redman threatened him unless he recanted his statement that Redman was involved in the robbery.

7

*Gang Evidence*

San Bernardino County Sheriff's Deputy Shawn Thurman and Long Beach Police Officer Fernando Archuleta testified as gang experts. Archuleta testified that Rollin 20s Crips gang members commit assaults, assaults with a deadly weapon, crimes involving possession of firearms or narcotics for sale, robberies, grand thefts, and homicides. Thurman testified that, in addition to the crimes Archuleta described, "home invasions" and making criminal threats were additional primary activities of the Rollin 20s Crips gang.

As predicate crimes,[1] the officers described the following: A robbery was committed on September 10, 2017, by a self-admitted member of the Rollin 20s Crips. Another self-admitted Rollin 20s Crips member was charged with committing a robbery on June 14, 2016, but convicted of grand theft.

As a predicate crime, Thurman testified that in 2018, Hall was charged with residential burglary, but convicted of second degree burglary.

As other predicate crimes, evidence showed Redman was convicted in January 1997 of possession of cocaine base for sale, in February 1998 of possession of cocaine base for sale, and in July 2009 and October 2009 of criminal threats.

---

[1] As described in further detail below, to prove the existence of a criminal street gang, the prosecution must establish a "pattern of criminal gang activity" (Pen. Code, § 186.22, subds. (a), (e)), which involves introducing evidence of predicate crimes (*People v. Oliva* (2023) 89 Cal.App.5th 76, 88).

According to Thurman, based on the "totality of the circumstances," Redman, Hall, Davenport, and Winters were all Rollin 20s Crips gang members.

As to Redman, Thurman's opinion was based on various tattoos, including one that said, "20 Crip" and various tattoos associated with Long Beach (which is known as Crip City). Thurman also noted many instances of the prominent display of logos of the Pittsburgh Steelers, which the Rollin 20s have adopted as a logo. Thurman further based his opinion on photographs and videos from Ector's phone showing Redman wearing gang colors and indicia, holding firearms, using gang verbiage, and openly admitting gang participation.

Thurman's opinion that Hall was a Rollin 20s crip gang member was based on "the totality of the circumstances, the investigation, [and] the Instagram." Thurman specifically relied on the spelling of Crips with an "x" and the blue bandana found on Hall when he was arrested, together with the evidence that Hall yelled out "On 20 Crips" during the robbery.

Thurman testified that the robbery and kidnapping of A.T. were committed for the benefit of, at the direction of, or in association with a criminal street gang in order to promote, further, or assist criminal conduct by members of the Rollin 20s Crips. A.T. reported the perpetrators said, "Crips" and "Long Beach." The robbery benefitted the gang because marijuana and cameras can be quickly sold for money and the firearms can be used by gang members offensively and defensively. Also, violent crimes boost the reputation of the gang and the status of the gang member. The Instagram messages prove the crimes were done at the direction of Hall.

9

*The Trial*

Defendants Hall and Redman were tried together. The jury found both guilty of home invasion robbery in concert (Pen. Code, §§ 211, 212.5, 213, subd. (a); count 1)[2] and simple kidnapping (§ 207, subd. (a); count 2). The jury found numerous enhancements to be true as to both defendants on both counts, including defendants acted in concert (robbery only), the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), that in the crime committed for the benefit of a street gang a principal was armed with a firearm (§ 12022.53, subd. (e)(1)), and defendants personally used a firearm (§ 12022.53, subd. (b)). In a bifurcated trial, the court found Redman's two prior strike convictions true.

On June 8, 2022, the court sentenced Redman to an aggregate term of 60 years to life for count 1 (robbery), consisting of an indeterminate term of 45 years to life (15 years to life, tripled), plus a consecutive determinate term of 15 years (10 years for the firearm enhancement & five years for the serious felony prior). The court stayed the punishment for count 2 (kidnapping) pursuant to section 654.

On the same date, the court sentenced Hall to an indeterminate term of 15 years to life for count 1 (robbery). The court imposed but struck the punishment for the firearm enhancements in both counts (§ 1385, subd. (c)) and stayed the punishment for count 2 (kidnapping) pursuant to section 654. The court imposed but stayed prison sentences on the remaining enhancements.

---

[2] All further statutory references are to the Penal Code unless stated otherwise.

On June 14, 2022, Hall filed a notice of appeal from the judgment. On July 5, 2022, Redman filed a notice of appeal from the judgment.

## DISCUSSION

*The Evidence Did Not Prove Kidnapping*

Defendants first contend that substantial evidence does not support the kidnapping charge. We agree.

The jury was instructed on the following elements of kidnapping, pursuant to CALCRIM No. 1215: "1. The defendant took, held, or detained another person by using force or by instilling reasonable fear; 2. Using that force or fear, the defendant moved the other person or made the other person move a *substantial distance*; 3. The other person did not consent to the movement." (Italics added.) Defendants contend there was no evidence that A.T. was moved a substantial distance.

To recap the facts, A.T. was initially assaulted at the front door, he was moved to the living room area, then he was moved upstairs to open the safe, then he was moved back downstairs to the kitchen, where he was tied up. Defendants contend each of these movements were incidental to the robbery.

A jury determines whether the movement was substantial in character by considering the totality of the circumstances. "Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the

11

attacker's enhanced opportunity to commit additional crimes." (*People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*), overruled on other grounds in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.) Where the movement is associated with another crime, courts have adopted an additional consideration: "in a case involving an associated crime, the jury should be instructed to consider whether the distance a victim was moved was *incidental to the commission of that crime* in determining the movement's substantiality. . . . [S]uch consideration is relevant to determining whether more than one crime has been committed . . . ." (*Ibid.*, italics added.)

It is well established that movement within a single premises is generally insufficient to constitute *aggravated* kidnapping. (See, e.g., *People v. Daniels* (1969) 71 Cal.2d 1119, 1140 ["when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209 [aggravated kidnapping]"].) However, the Attorney General contends that a more lax standard applies to *simple* kidnapping. To evaluate this contention, we first explain the difference between the two.

Section 209 defines aggravated kidnapping as carrying "away an individual to commit robbery, rape, oral copulation, sodomy," and certain enumerated sex crimes. (*Id.*, subd. (b)(1).) Critically, section 209, subdivision (b)(2), provides, "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." Section 207, subdivision (a), defines simple kidnapping as carrying someone away into "another part of the same county."

12

(*Ibid.*)  Historically, this meant that the movement element of simple kidnapping focused entirely on the amount of distance the person was moved. (*People v. Bell* (2009) 179 Cal.App.4th 428, 436.)  However, in *Martinez,* our high court overruled its own precedent and prescribed a more qualitative assessment of the movement, as described above, which included consideration of movements incidental to another crime.  (*Martinez, supra,* 20 Cal.4th at p. 237, fn. 6.)  This change brought "the standard closer to the one for aggravated kidnapping."  (*Bell,* at p. 436.)

*People v. Williams* (2017) 7 Cal.App.5th 644 is instructive. There, the defendants were charged with simple kidnapping arising from the robbery of a cell phone store in which they moved a security guard and an employee approximately 50 feet from the front of the store to the back of the store.  (*Id.* at p. 671.)  The defendants then moved an employee to an adjoining vault room where they ordered him to open the safes.  (*Ibid.*)  The court concluded that these movements were merely incidental to the robbery and did not constitute a separate kidnapping offense.  (*Id.* at p. 672.)  The court rejected the argument that this movement shielded the employees from view and thus put them at increased risk of harm.  (*Id.* at p. 669.)  "[T]he robbers had good reason to move the victims to the back of the store to achieve their objective of emptying the cages and safes of merchandise without detection by customers or other people outside the store.  Their objective was robbery, not harm to the store employees . . . ."  (*Id.* at p. 670.)

The same is true here.  When the assailants entered A.T.'s home, they immediately began beating him.  The movement did not occur until after they had beaten him into submission.  The movement up the stairs was a short distance and was plainly for the purpose of accessing A.T.'s safe.  The movement back down the stairs was to secure him while they continued to

13

ransack the house. The overall distance moved was short, and the purpose of the movements was to facilitate the robbery. Although defendants continued to threaten and physically assault A.T., force and fear is an essential part of robbery and is already considered in the punishment for robbery. (§ 211 ["Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear"].) Moreover, there is no evidence here that the *movement* had any substantial impact on those aspects of the crime. Accordingly, the movements were merely incidental to the crime of robbery.

The Attorney General contends we should find the movements to be substantial in light of *People v. Waqa* (2023) 92 Cal.App.5th 565. There, as the victim was emerging from a small restroom stall, the defendant grabbed her and dragged her into a large stall where he raped her. (*Id.* at pp. 574-575.) Although the court conceded that the evidence of substantial movement was somewhat weak (*id.* at pp. 582-583), it ultimately found the evidence "sufficient" because the movement took the victim "farther from the restroom's exit and gave [defendant] more room to maneuver, facilitating the rape and other potential crimes." (*Id.* at p. 583.)

To state the obvious, this appeal concerns a robbery, not a rape, and thus *People v. Williams, supra,* 7 Cal.App.5th 644 is plainly more analogous. Other courts have recognized that robbery and rape are crimes with very different contexts: "While 'a rape victim is certainly more at risk when concealed from public view and therefore more vulnerable to attack,' the same is not necessarily true for a robbery victim." (*Id.* at p. 669.) Here, the assailants began beating A.T. the moment they got in the door, and thus it is clear that the danger to A.T. did not depend on him being forcibly moved.

14

Accordingly, we reverse defendants' convictions for simple kidnapping.

*The Evidence Against Redman Was Sufficient to Support Robbery*

Redman contends the evidence against him to support home invasion robbery was insufficient. In particular, Redman argues that much of the evidence against him came through the testimony of Winters, who was an accomplice. Redman contends that Winters's testimony was not sufficiently corroborated. We disagree.

Section 1111 provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

"This statute reflects the Legislature's determination that "'because of the reliability questions posed by'" accomplice testimony, such testimony "'by itself is insufficient as a matter of law to support a conviction.'" [Citation.] "Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that, "'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime.'" [Citation.] "'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.'"" (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) "The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and "'may be circumstantial or slight and entitled to little consideration when standing alone'" [citation]. "The trier of

15

fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32-33.)

Here, there was ample corroboration of Winters's testimony. First, there were the GPS pings on Redman's ankle monitor that perfectly matched Winters's story, from meeting Redman at the Burger King restaurant earlier in the day, to dropping him off at Hall's house, to acting as the getaway driver after the robbery, to tracking their path afterward. Second, some of the stolen items were found in Redman's trunk, which is consistent with Winters's testimony that the items were placed there after the robbery. Third, the surveillance video from A.T.'s home shows Redman's vehicle near the front of A.T.'s home about the time the robbery took place. Fourth, Hall's Instagram posts confirm that Redman was involved in the planning and execution of the robbery.

Redman picks nits with some of this evidence. For example, regarding the GPS pings on his ankle monitor, Redman argues, "to corroborate Winters' testimony that Redman acted as the 'get away' driver, it should show Redman's pings staying for some period of time at the aqueduct location well before the 3:30 p.m. time frame as he waited for the perpetrators. But according to Thurman's testimony, the GPS just pinged Redman's blue tag across from the aqueduct at 3:25 p.m. then on to Main Street until he reached a gas station at 3:37 p.m." Regarding the surveillance video, Redman argues that no witness identified the exact make and model of the vehicle, and it was not possible to see who was inside the vehicle.

These arguments miss the point. The corroborating evidence does not need to independently prove guilt. The evidence simply must

16

support the accomplice testimony and permit a reasonable inference that the accomplice's testimony is true. Construing the evidence in favor of the judgment, as we must, multiple details of Winters's testimony were corroborated by independent evidence. Nothing more was required to support the verdict.

Alternatively, Redman contends the evidence supporting the robbery verdict was insufficient even considering the accomplice testimony. He focuses on the mens rea required of an aider and abettor: "the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

Redman contends there was no evidence that he knew a robbery was going to take place and intended to assist in it. He relies heavily on Winters's testimony that Redman initially told Winters he was to help retrieve some of Halls' property that had been stolen. However, there was nothing in the record to corroborate the idea that property had been stolen by A.T. from Hall, and the jury was free to reject Redman's explanation as being a way to deceive Winters into agreeing to help. The fact that Redman helped round up a posse, provided the firearm to be used, and then acted as the getaway driver, provided a reasonable inference that Redman knew a robbery was to occur and intended to assist in it.

*The Court Was Not Required to Bifurcate the Gang Enhancements*

Both defendants contend the court erred by refusing their request to bifurcate the trial of the gang enhancements from the underlying charges.

17

At the outset, we dispose of one of defendants' primary arguments. Both contend that newly enacted section 1109 applies retroactively. Section 1109, subdivision (a), provides, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases . . . ." This statute became effective January 1, 2022. (Stats. 2021, ch. 669, § 5.) The trial here took place in 2020. Although the statute does not contain any express retroactivity provision, defendants contend the statute applies retroactively under the principles announced in *In re Estrada* (1965) 63 Cal.2d 740.

Until recently, the Courts of Appeal were split on this issue. (*People v. Burgos* (2024) 16 Cal.5th 1.) However, shortly before the filing of this opinion, the California Supreme Court settled that split of authority by holding that section 1109 does not apply retroactively. (*Burgos,* at p. 8.)

Accordingly, defendants must rely on their fallback argument, which is that the court abused its discretion under Evidence Code section 352 by refusing to bifurcate. Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) "'"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"' [Citation.] '[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is

18

statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*People v. Williams* (2013) 58 Cal.4th 197, 270-271.)

Although we recognize that gang evidence inherently carries the risk of prejudice, we find no abuse of discretion in refusing to bifurcate because the gang evidence was relevant to the underlying charges and defenses.

As to Hall, the gang evidence was relevant to identity. Hall relies heavily on A.T.'s testimony that he does not remember seeing Hall in the house. For example, in the very first paragraph of his opening brief, Hall states, "[A.T.] testified that Hall did not enter A.T.'s home, did not participate in the robbery, nor did Hall say or do anything that was related to a gang."[3] In other words, Hall put identity at issue. A.T. testified that one of the robbers claimed a Crips gang affiliation. Therefore, the fact that Hall was a Crips gang member was relevant to identifying him as one of the perpetrators. Moreover, the Instagram messages of Hall planning the robbery are replete with references to the Crips, and thus it is difficult to conceive how those could have been presented to the jury without revealing Hall's gang affiliation.

---

[3] What A.T. actually said was that he could not say with certainty whether Hall was or was not in the house. He did initially tell an investigating officer that Hall was not in the home. However, the surveillance video tells a different story. It was ultimately within the jury's purview to determine what the facts were.

19

As to Redman, he put intent at issue by relying on Winters's account that Redman wanted him to retrieve items that had been stolen from Hall. The evidence that Redman was a member of a violent criminal street gang, one of whose primary activities was home invasion robberies, and that one of the assailants claimed Crips affiliation, was relevant to assessing his intent. In particular, the testimony that gangs use the proceeds of robberies to fund its activities provided a motive for Redman to aid and abet a robbery.

To the extent there was any error in refusing to bifurcate the trial, we conclude the error was harmless. The erroneous admission of evidence is analyzed under the *Watson* harmless error standard (*People v. Watson* (1956) 46 Cal.2d 818), pursuant to which we reverse only if, viewing the record in its entirety, we are of the opinion that it is more likely than not the defendant would have achieved a better result in the absence of the error. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

The evidence against both defendants was overwhelming.

As to Hall, the surveillance footage from A.T.'s home shows him approaching the home, and then later leaving out the back, with the two other assailants. Although Hall has suggested, based on A.T.'s testimony, that he was merely at the door and three other black men could have pushed their way into the house, the reality is that the surveillance footage only shows a total of three people, including Hall. Moreover, Hall's clothing and backpack, which were worn during the robbery, were found in Redman's car along with the stolen goods. Finally, and perhaps most damning, Hall's Instagram messages plainly show him planning a robbery of A.T.'s home.

As to Redman, pursuant to Winters's testimony, Redman helped form the posse and provided the firearm to be used in the robbery. He also served as the getaway driver. The GPS ankle monitor perfectly aligned with

20

Winters's account and places Redman at the scene of the crime. His vehicle was also caught in the surveillance footage. Moreover, the next day he was arrested and some of the stolen goods were found in his trunk.

Regardless of any impact from the gang testimony, this was not a close case as to either defendant. Accordingly, any error in admitting the gang evidence was harmless.

*The Gang Enhancements Must be Vacated*

Defendants contend the gang enhancements must be vacated in light of the changes to section 186.22 enacted by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699; Assembly Bill 333), which made substantial changes to how a "criminal street gang" is defined and proven at trial. "Assembly Bill 333 made the following changes . . . : First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons. [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth,

21

Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) Although the amendments became effective on January 1, 2022, which was after the trial in this case, the substantive changes made by Assembly Bill 333 are retroactive.[4] (*Tran,* at pp. 1206-1207.)

The Attorney General concedes that the gang enhancements must be vacated, and we agree. The jury instructions (understandably) did not reflect the retroactively applicable standards for determining the existence of a criminal street gang. For example, the jury was not instructed that the predicate offenses must have "commonly benefited [the] criminal street gang, and the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).) Thus, the enhancements that depended on affiliation with a criminal street gang must be vacated. This includes the enhancements under sections 186.22, subdivision (b) and section 12022.53, subdivision (e)(1).

*The Jury Received a Proper Limiting Instruction Regarding Hall's Instagram Messages*

Redman contends that the Instagram messages from Hall's account were inadmissible hearsay. We agree in part. Hall's Instagram messages were inadmissible against Redman, but the jury was given a proper limiting instruction and thus there was no error.

---

[4] We emphasize the *substantive* changes because Assembly Bill 333 also enacted section 1109, which, as we noted above, our high court recently deemed not retroactive.

Hall's Instagram messages were admitted over both defendants' hearsay objection based on the business records exception. Defendants also objected under Evidence Code section 352. Under the business records exception, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.) Here, the prosecution introduced an affidavit of a custodian of records from Facebook (owner of Instagram) attesting to the authenticity of the records of Hall's private messages.

However, the business record exception has limits—and it does not extend as far as the prosecution suggests. The only "act, condition, or event" that Instagram recorded was the fact that Hall said the things he said. However, Instagram did not record the fact that Redman was actually going to Hall's house to provide a gun; presumably, no one at Instagram had any knowledge of that, and it certainly would not have been part of the regular course of Instagram's business. Thus, the claimed "business record" could only support the fact that Hall said the things he said, not the truth of what Hall said. This would not prove to be a problem as to Hall, because the statements were made by Hall and thus were admissions of a party opponent that were admissible for the truth of the matter asserted. (Evid. Code, § 1220.) However, under Evidence Code section 1220, such statements are only admissible "when offered against the declarant . . . ." Redman was not

23

the declarant, and thus the statements were not admissible against him under Evidence Code section 1220.

Nevertheless, there was no error because the court gave a correct limiting instruction. Consistent with CALCRIM No. 305, the jury was instructed, "You have heard evidence that defendant Phalon Hall made a statement before trial. You may consider that evidence only against him, not against any other defendant."

Redman argues that, notwithstanding the limiting instruction, the evidence rendered his trial fundamentally unfair under the due process clause because the evidence was unreliable. (See *Michigan v. Bryant* (2011) 562 U.S. 344, 370, fn. 13 ["the Confrontation Clause is not the only bar to admissibility of hearsay statements at trial. . . . [T]he Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence"].) However, he has offered no explanation for why the evidence was unreliable. To the contrary, the evidence appears to be highly reliable. Instagram is not likely to have altered the statement in any way, and Hall had no reason to be untruthful in his private messages recruiting an accomplice.[5]

Redman also contends that we should find the limiting instruction to be ineffectual. He observes that under the *Aranda-Bruton* doctrine (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123) courts have abandoned any faith in the curative properties of a limiting instruction. "The *Aranda/Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit

---

[5] For this reason, the evidence was *highly* probative against Hall and thus not subject to exclusion under Evidence Code section 352.

24

the out-of-court statement of a nontestifying defendant that incriminates a codefendant.  As we have observed, "'*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.'"'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 869 overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

However, as Redman is forced to concede, the *Aranda/Bruton* rule provides only "'a narrow exception to the general rule that juries are presumed to follow limiting instructions . . . .'" (*People v. Homick* (2012) 55 Cal.4th 816, 874.)  Crucially, "the confrontation clause issues addressed by the *Aranda-Bruton* doctrine *only applies to testimonial statements* after *Crawford v. Washington* (2004) 541 U.S. 36 and its successors." (*People v. Tran, supra*, 13 Cal.5th at p. 1194, italics added.)  Redman concedes that Hall's private messages were not testimonial in nature.

The upshot is that, outside of the confrontation clause context, we continue to assume that the jury follows its instructions.  Because the Instagram messages were admissible against Hall and the jury was given a proper limiting instruction as to Redman, there was no error.

In any event, introduction of the evidence was harmless under the *Watson* test.  The Instagram messages only mentioned Redman briefly, asserting that Redman was bringing a gun for Hall.  However, the jury already heard that through Winters's testimony.  The Instagram messages were merely cumulative of other evidence and thus not sufficiently prejudicial to warrant reversal.

25

*There Was No Abuse of Discretion in Admitting Evidence of Redman's Parole Status and Prior Gang Convictions*

Redman contends the court abused its discretion under Evidence Code section 352 by admitting evidence of (1) Redman's parole status at the time of the robbery, and (2) prior offenses committed by Redman in his capacity as a member of the Rolling 20s Crips. We disagree.

We begin with Redman's parole status. The case against Redman had two central pillars: Winters's testimony, and the GPS tracking data that strongly corroborated Winters's testimony and put Redman at the scene of the crime. The tracking data evidence came in through the testimony of Redman's parole officer and would only make sense to the jury if it knew that Redman was wearing an ankle monitor as a condition of his parole. The evidence was *highly* probative, and the mere inference that Redman had committed an unspecified recent crime, while somewhat prejudicial, was not enough to "substantially outweigh[]" the probative value. (Evid. Code, § 352.)

With regard to Redman's priors: to prove that Redman committed robbery for the benefit of a criminal street gang, the prosecution was required to prove that the Rolling 20s Crips was, in fact, a criminal street gang. Under section 186.22, this required the prosecution to prove a "pattern of criminal gang activity." (*Id*., subds. (a), (e).) Redman's prior offenses were directly relevant to that issue. Moreover, our high court has held that, in the context of active participation in a criminal street gang (§ 186.22, subd. (a)), the prejudice from using priors of the defendant does not require exclusion. In *People v. Tran* (2011) 51 Cal.4th 1040 (*Tran*) the court observed, "[B]ecause the prosecution is required to establish the defendant was an active participant in a criminal street gang and had knowledge of the gang's criminal activities, the jury inevitably and necessarily will in any

26

event receive evidence tending to show the defendant actively supported the street gang's criminal activities. That the defendant was personally involved in some of those activities typically will not so increase the prejudicial nature of the evidence as to unfairly bias the jury against the defendant. In short, the use of evidence of a defendant's separate offense to prove a predicate offense should not generally create 'an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*Id.* at p. 1048.) While the present case involves the gang enhancement rather than the separate charge of active participation in a criminal street gang, the enhancement requires proof that the defendant has "the specific intent to promote . . . criminal conduct by gang members" (§ 186.22, subd. (b)(1)), and thus the evidence will necessarily associate the defendant with gang-related criminal activity. Accordingly, as in *Tran*, the fact that the defendant was personally involved in prior criminal activity does not add such a high degree of prejudice that it creates an intolerable risk to the fairness of the proceedings. (*Tran*, at p. 1048.)

Redman argues that the evidence here lacked probative value because there were other gang offenses the prosecution could have used, and defense counsel even offered to stipulate to predicate offenses. But the *Tran* court addressed that argument as well: "Defendant argues that evidence of a defendant's separate offense on another occasion should not be admitted when it is 'cumulative.' By this he seems to mean that the evidence should not be admitted when the prosecution has the ability to develop evidence of offenses committed on separate occasions by other gang members. But defendant cites no authority for the argument that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence. The

27

prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute. [Citations.] But the prosecution cannot be compelled to "'present its case in the sanitized fashion suggested by the defense.'" [Citation.] When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion." (*Tran, supra,* 51 Cal.4th at pp. 1048-1049.)

Here, Redman's priors introduced by the People were convictions for possession for sale of cocaine base and criminal threats. These were not particularly inflammatory crimes. Accordingly, the prejudice did not substantially outweigh the probative value.

*There Was No Abuse of Discretion in Admitting Photographs of Redman with Firearms and Gang Affiliated Clothing*

Redman contends the court abused its discretion by admitting photographs of him that were downloaded from Ector's phone. The photographs depicted Redman with firearms and wearing gang-affiliated clothing. Redman contends this evidence was unduly prejudicial under Evidence Code section 352. We disagree.

The photographs were relevant to prove that Redman committed the robbery in association with the Rollin 20s Crips gang. (§ 186.22, subd. (b)(1).) They were no more prejudicial than any other evidence proving gang affiliation. Redman questions the probative value of the photographs, noting that the firearms could have been props, or the photographs could have been part of a rap or a joke. However, those arguments go to the weight of the evidence and do not affect the admissibility of the photographs. Accordingly,

28

the prejudice did not substantially outweigh the probative value of the evidence.

*The Court Did Not Abuse Its Discretion in Refusing Redman's Request to Excuse a Juror*

Redman contends the court abused its discretion in refusing to excuse Juror No. 7. Section 1089 permits the court to remove a juror for "good cause" if the juror is "found to be unable to perform his or her duty." (*Ibid.*) We review any such ruling for abuse of discretion. (*People v. Powell* (2018) 6 Cal.5th 136, 155 ["Removal of a juror under section 1089 is committed to the discretion of the trial court"].)

The relevant proceedings are as follows: At the start of trial, before counsel's opening statements, one of the sworn jurors, identified as Juror No. 7, informed the court that when he exited the courtroom on a break, he saw and recognized Deputy Cory Drost.[6] The juror said he had not recognized Drost's last name when the list of potential witnesses had been called because he never knew his last name. The juror knew Drost because the juror does business with Drost's father, and Drost used to work with his father over 12 years ago prior to Drost working in law enforcement. The juror explained, "They would come in, place orders, phone calls." The juror did not have a personal relationship with Drost, but just knew him through work. The juror said that even though he did not "hang out" with Drost and they were not friends, he still considered Drost a friend. When first asked if his contact with Drost or Drost's father would affect his view of credibility,

---

[6] Deputy Drost was one of the first responders to A.T.'s home for the San Bernardino County Sheriff's Department and was a witness for the prosecution at trial.

the juror said, "It could." When asked if he would give Drost "the benefit" if one of the attorneys was "grilling" Drost and Drost said something that objectively did not appear accurate or truthful, the juror said, "I don't know." Hall's counsel told the juror, "Convince me that you're not going to give him any extra credibility or, from the prosecutor's side, any less credibility," and asked the juror, "What are your thoughts on that? Can you sit here and follow the directions of the judge, first of all, the law?" The juror responded, "Yes." Hall's counsel asked, "And you do realize that law enforcement, they're humans just like everybody else?" The juror replied, "Right. Right. Right." Counsel then inquired, "Are you going to give the guy in the uniform and the badge, are you going to give that more credibility or less credibility? I'm trying to be neutral here." The juror responded, "Yeah. Yeah. I could just be fair."

The court then questioned Juror No. 7, asking, "Knowing what you know about the prospective witnesses, knowing what you know about Mr. Drost, can you give both sides a fair trial?" The juror responded, "Yes." The court asked, "Okay. You wouldn't let your business relationship with Deputy Drost affect your ability to be fair?" The juror responded, "No."

Redman's attorney followed up asking, "Do you think that you're going to be able to put aside that friendship completely out of your mind when he takes the stand?" The juror replied, "I can do that." Counsel asked, "Positive?" The juror replied, "Yes."

At that point, Redman's counsel requested the court excuse juror number seven and replace him with one of the alternates. The court denied Redman's request to excuse the juror. The court observed that just because one may become friendly with customers over time, that did not mean one

30

judges their credibility. The court concluded the juror was vehement that he could be fair, and the court believed him.

We find no abuse of discretion in that ruling. While Juror No. 7's initial responses raised concerns, the juror ultimately assured the court that he could be fair. It was within the court's purview to assess the credibility of that assertion. The court found it credible, and there is nothing in the record that would allow us to say the court's determination was unreasonable.

*The Court Did Not Abuse Its Discretion in Refusing to Reveal Confidential Juror Information*

Redman's final contention is that the court abused its discretion in refusing to unseal confidential juror information to permit Redman to investigate potential juror misconduct. We review the court's ruling for abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.) We find no abuse.

The relevant proceedings are as follows: After trial, Redman's counsel filed a request to obtain the disclosure of jurors' contact information pursuant to Code of Civil Procedure section 237, subdivision (b), to investigate potential juror misconduct to support a motion for new trial. He proffered that he had been advised that during juror deliberations there had been direct contact between at least one juror and an individual that had an effect on that juror's ability to remain fair and impartial.

The prosecution filed an opposition to Redman's request. The prosecutor explained that the basis for Redman's request for a hearing was a jail telephone call between Redman and his girlfriend, D.B. The transcript of that call was attached as an exhibit. In the transcript, Redman's girlfriend explains that she was talking to some ladies in the hallway when the bailiff

31

came out to see if the jury was ready, and to D.B.'s surprise, the ladies she was talking to were on the jury. They were "just talkin' about the news, the kids, like all kinda shit"—i.e., small talk. After the verdict, D.B. recounted, "So, then I see- you had a lady on your jury that looked like a smoker. I see her in the parking lot, so I drive up on her. I say, so, 'How did you guys find him guilty though?' Like 'How did you guys find him guilty?' And she hopped in her [car] and locked her door. I'm like, what the fuck. Like this is retarded, and just laughed."

The court subsequently held an evidentiary hearing and was provided a transcript of a second recorded jail call between Redman and D.B. In the second transcript, D.B. elaborated some about talking to the jurors about drinking soda and eating ice to calm the nerves. They also talked about a dog. After that, D.B. saw some jurors whispering and believed they had finally recognized that D.B. was related to Redman.

Redman called D.B. to testify at the hearing, but she invoked her Fifth Amendment right and did not testify. San Bernardino County Sheriff Deputy Zachary Heiner, who was the bailiff on duty in the courtroom during the trial, testified that he recalled D.B. was listed as a potential witness and was excluded from the courtroom. He saw D.B. seated outside the courtroom in close proximity to jurors because there was limited seating. He did not observe any conversation between D.B. and jurors.

The court subsequently denied Redman's motion for disclosure of juror information, finding Redman did not make a prima facie showing that juror misconduct occurred that prejudiced his case.

We find no abuse of discretion in that ruling. After the recording of a jury's verdict in a criminal trial, the trial court must seal "personal juror identifying information" such as jurors' names, addresses, and telephone

numbers.  (Code Civ. Proc., § 237, subd. (a)(2).)  Thereafter, a criminal defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."  (Code Civ. Proc., § 206, subd. (g).)  Code of Civil Procedure section 237 provides, "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information."  (*Id.*, subd. (b).)  The protections afforded to juror private information are driven by the "twin concerns of juror safety and juror privacy . . . ."  (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091.)

"Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred . . . .'"  (*People v. Cook* (2015) 236 Cal.App.4th 341, 345.)  The alleged misconduct must be "'of such a character as is likely to have influenced the verdict improperly.'" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)

Here there was no evidence of misconduct, and the interactions between D.B. and the jurors were not likely to have influenced the jury.  There is no evidence the jurors knew they were talking to someone associated with Redman, there is no evidence that the jurors discussed the case with D.B., and there is no evidence that D.B. attempted to influence the verdict.  As the court observed, if anything, D.B.'s conversations with the juror were more likely to engender sympathy for Redman.  Accordingly, the court did not abuse its discretion in refusing to disclose sealed juror information.

33

## DISPOSITION

The convictions of Hall and Redman for kidnapping are reversed. The sentencing enhancements imposed pursuant to sections 186.22, subdivision (b) and section 12022.53, subdivision (e)(1) are reversed. The matter is remanded for a complete resentencing consistent with this opinion. In all other respects, the judgment is affirmed.



SANCHEZ, J.

I CONCUR:


GOETHALS, J.


34

Moore, Acting P.J., Dissenting and Concurring.

After receiving accurate jury instructions, 12 jurors deliberated and found defendants Phalon Amad Hall and Patrick Kenya Redman guilty of committing a home invasion robbery and a simple kidnapping.

I respectfully dissent from the majority's analysis that there was insufficient evidence to support the simple kidnapping verdicts. Reasonable people can certainly disagree with the 12 jurors, but the testimony and the crime scene photos support their unanimous judgment that the victim was moved a "substantial distance" at gunpoint. (See CALCRIM No. 1215.) In all other respects, I concur with the majority.

This minority opinion will briefly: 1) consider the standard of review; 2) state the multi-factored test for simple kidnapping; and 3) identify the substantial evidence in the record that supports the jury's verdicts.

1. *The Standard of Review*

In a substantial evidence review, the word "substantial" is something of a misnomer. The word "substantial" suggests that an appellate court determines whether there is "enough" evidence in the record to support the jury's verdict. But that is wrong. A substantial evidence review is essentially a binary analysis. That is, either substantial evidence exists in the record, or it does not. (See *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 ["It is an elementary, but often overlooked, principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is *any substantial evidence*, contradicted or uncontradicted, which will support the conclusion reached by the jury"], italics added.)

1

"[W]e review *the entire record in the light most favorable to the judgment* to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact *could find* the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27, italics added.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "The reviewing court presumes in support of the judgment the existence of every fact the jury *could reasonably deduce* from the evidence." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208, italics added.)

2. *The Multi-Factored Test for Simple Kidnapping*

Generally, to establish any form "of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." (*People v. Jones* (2003) 108 Cal.App.4th 455, 462.) The third element—that the victim was moved a substantial distance—is known as the asportation element. (*People v. Rayford* (1994) 9 Cal.4th 1, 14.)

Aggravated kidnapping and simple kidnapping both have an asportation element, but the legal tests for proving a "'substantial distance'" are different. (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)

2

In an aggravated kidnapping, the asportation element is a conjunctive test with two requirements:  "aggravated kidnapping *requires* movement of the victim that [1] is not merely incidental to the commission of the underlying crime and [2] that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself."  (*People v. Martinez* (1999) 20 Cal.4th 225, 232 (*Martinez*), italics added, overruled on other grounds in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.)

By contrast, in a simple kidnapping, the asportation element is a multi-factored test with several components:  "A jury determines whether the movement was substantial in character by considering 'the totality of the circumstances.  Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, *but also such factors* as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.'"  (*People v. Perkins* (2016) 5 Cal.App.5th 454, 465, italics added, quoting *Martinez*, *supra*, 20 Cal.4th at p. 237.)

Here, the trial court instructed the jurors:  "Substantial distance means more than a slight or trivial distance.  In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement.  [¶]  Thus, in addition to considering the actual distance moved, *you may also consider other factors such as* whether the distance the other person was moved was beyond that merely incidental to the commission of Home Invasion Robbery[,] [w]hether the movement increased the risk of physical or psychological harm, increased the danger of a

3

foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection." [1] (CALCRIM No. 1215, italics added; see also *People v. Pride* (1992) 3 Cal.4th 195, 247 [a multi-factored test "does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive"].)

*3. Application and Analysis*

Based on the testimony and the crime scene photos, the jurors could have reasonably concluded that the distance the victim was moved at gunpoint was (a) more than slight or trivial, (b) increased the danger of his foreseeable escape attempt, (c) increased the risk of his physical or psychological harm, (d) gave the attackers a greater opportunity to commit additional crimes, or (e) decreased the likelihood of their detection.

Alexander T. (Alexander) testified that at about 3:00 p.m., three attackers moved him at gunpoint approximately 20 feet away from his front door, thereby decreasing the likelihood of Alexander's escape and the detection of the home invasion robbery, which was being committed in broad daylight. (See Appendices A & B; see also *Martinez*, *supra*, 20 Cal.4th at p.

---

[1] Neither the defendants, nor my colleagues, appear to challenge the legal accuracy of the court's jury instruction. (See *Martinez*, *supra*, 20 Cal.4th at p. 237.) Consistent with *Martinez*, the pattern jury instruction for a simple kidnapping *does not require* the jury to find that the distance of the movement "was beyond that merely incidental to the commission of" an underlying crime. (CALCRIM No. 1215 [Simple Kidnapping].) Conversely, the pattern jury instruction for an aggravated kidnapping *does require* the jury to find that the distance of the movement be "beyond that merely incidental to the commission of" the underlying crime. (See CALCRIM No. 1203 [Kidnapping: For Robbery, Rape, or Other Sex Offenses].)

237 [by decreasing the likelihood of detection, the movement increases "the risk of harm"].)

The attackers then moved Alexander about 10 feet to the staircase, which faced the rear of the home. (See Appendix C.) One of the men asked if Alexander had ever been in the military (he had), and if he had "ever been shot before." Alexander said: "I was scared I was gonna get shot but you've just gotta push through." (See *People v. Lara* (1974) 12 Cal.3d 903, 908 [the fact that potential for physical or psychological harm is not actualized during the asportation is irrelevant]; see also *People v. Robertson* (2012) 208 Cal.App.4th 965, 984 ["'harm' includes 'mental suffering'"].)

All three attackers then moved Alexander at gunpoint up an L-shaped staircase. (See Appendices D & E.) Based on the configuration of the staircase, a jury could reasonably find that this movement increased the risk of physical harm through an accidental (or intentional) firearm discharge. Alexander said, "I remember as we were walking upstairs somebody -- somebody told me to stop moving so fast, because they asked if I was . . . gonna try something." (See *Martinez, supra*, 20 Cal.4th at p. 233 ["'The fact that these dangers [did] not in fact materialize does not, of course, mean that *the risk of harm* was not increased'"], italics added.)

Once upstairs, the attackers then moved Alexander away from the stairs past a loft area where they had him open a safe, thereby giving the men an opportunity to commit the crime of robbery. (See Appendix F.) Alexander testified that he was unable to open the safe on the first attempt, but he was eventually able to do so. Inside of the safe were two rifles, which increased the danger of the attackers committing additional crimes during the course of the home invasion robbery (e.g., assault with a firearm).

5

Alexander also testified there was a sword near the safe, and he thought about using it to make an escape attempt, "but I look back and I'm glad that I didn't." (See *People v. Perkins, supra,* 5 Cal.App.5th at p. 465 [one of the factors the jury is to consider in evaluating the asportation element is "the danger inherent in a victim's foreseeable attempts to escape"].)

The attackers then moved Alexander from the second floor, back down the stairs, and into the kitchen/living room area—a distance estimated at more than 15 feet—which the 12 jurors could have reasonably found was more than slight or trivial. (See *People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 ["we have repeatedly stated no minimum distance is required to satisfy the asportation requirement"]; see also *People v. Singh* (2019) 42 Cal.App.5th 175, 187–188 ["we cannot say the movement [of about 10 feet] was insubstantial considering the totality of the circumstances"].)

Eventually, the attackers moved Alexander into a chair where they secured him with zip ties and a leash. (See Appendix G.) The attackers then committed multiple violent assaults: pistol-whipping Alexander with a handgun and beating him with the butt end of one of the rifles they had taken from his safe.

At some point, the attackers also moved Alexander into—and then later out of—his attached garage. Alexander said the episode was traumatic and his memory of when he was taken to the garage was not entirely clear. Alexander testified that while in the garage he considered trying to lock the men inside and attempt an escape. He said there was "another gun hidden in the open in the garage and I was hoping they didn't see it." (See *People v. Shadden* (2001) 93 Cal.App.4th 164, 169 [where the "movement changes the victim's environment, it does not have to be great in

6

distance to be substantial"].)  Alexander testified that when the attackers finally left, they had been in his home for about an hour.

In sum, there is substantial evidence that supports the jury's factual determination that Alexander was moved a substantial distance.  We simply have no legal authorization to substitute our judgment for that of the jury.  (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; see also *People v. Gilbert* (1938) 26 Cal.App.2d 1, 21 ["No rule of criminal law and procedure is better established in this state"].)  Thus, I would affirm the defendants' convictions for simple kidnapping.

The majority's reliance on the case of *People v. Williams* (2017) 7 Cal.App.5th 644 (*Williams*), is not persuasive.  (Maj. opn., *ante*, at p. 13.)

In *Williams*, the defendants moved two employees of an AT&T store from the front of the store to the back of the store, a distance about 50 feet, and then took one of the employees to the vault room and ordered him to open the safes, before taking him back to the break room.  (*Williams*, *supra*, 7 Cal.App.5th at p. 671.)  The Court of Appeal reversed the defendants' simple kidnapping convictions because the court found this movement of the victims "was merely incidental to the robbery and was therefore not substantial." (*Id*. at p. 672.)  However, the *Williams* court did not analyze any of the other relevant factors, which the California Supreme Court has expressly stated are to be weighed by a jury when considering whether the distance of a victim's movement was substantial in a simple kidnapping case.  (See *Martinez*, *supra*, 20 Cal.4th at p. 237; see also CALCRIM No. 1215.)

As another panel of this court correctly held, whether a victim's movement is incidental to another crime "is *not* a separate threshold determinant of guilt or innocence" in a simple kidnapping charge, but rather

7

one of the many "factors to be considered *in determining the movement's substantiality*." (*People v. Bell, supra,* 179 Cal.App.4th at p. 440.) To the extent *Williams, supra,* 7 Cal.App.5th 644, holds otherwise, it is wrong.

To reiterate and conclude, the issue is *not* whether this court agrees or disagrees with the jury's determination that Alexander was moved "more than a slight or trivial distance." (See CALCRIM No. 1215.) The only relevant issue is whether *there is any* substantial evidence in the record to support the jury's factual finding. There is.


MOORE, ACTING P.J.

8

APPENDIX A



APPENDIX B



APPENDIX C



APPENDIX D



APPENDIX E



APPENDIX F



APPENDIX G

